[S. F. No. 11195. In Bank.—April 30, 1926.]

HARRIET M. GRAGG et al., Respondents, v. CHARLES CULP, Appellant.

[1] DEEDS—DESCRIPTION—QUANTITY OF LAND—RULE.—It is the invariable rule, early adopted in this state, that when a piece of land is conveyed by metes and bounds, or any other certain description, all included within those bounds, or that description, will pass, whether it be more or less than the quantity stated in

---

1. See 9 **Cal. Jur.** 315.

the deed. The quantity being the least certain part of the description must yield to the boundaries or numbers, if they do not agree.

[2] QUIETING TITLE—PRESCRIPTION—ADVERSE POSSESSION—EVIDENCE. In this action to quiet title to certain land it is held that the claim of ownership by prescription and adverse possession made by defendant was not sustained and that the trial court committed no prejudicial error in the trial.

(1) 9 C. J., p. 224, n. 40.   (2) 2 C. J., p. 276, n. 59.

APPEAL from a judgment of the Superior Court of Monterey County. J. A. Bardin, Judge. Affirmed.

The facts are stated in the opinion of the court.

C. F. Lacey for Appellant.

Zabala & Sargent and Russell Scott for Respondents.

SEAWELL, J.—An appeal from a decree rendered in favor of the plaintiffs, quieting title to 38.85 acres of land situate within township No. 17 south, range No. 2 east, M. D. M., county of Monterey.

By letters patent, June 10, 1875, the United States of America granted to Jonathan Roberts, plaintiffs' predecessor, full payment therefor having been made by said Jonathan Roberts to the United States, grantor, lot No. 2 (27.35 acres), section 19, lot No. 6 (42.81 acres), section 29, and lot No. 1 (30.57 acres), and lot No. 2 (32.27 acres), and the northeast quarter of the southeast quarter (40 acres) of section 30, and, as enumerated in said patent, "containing 178 acres according to the official plat of the surveyor of the said lands returned to the general land office by the surveyor general."

In February, 1900, the United States, by patent, granted to Virginia E. Ball, defendant's predecessor, the following land: The southwest quarter of the southwest quarter (40 acres), section 29; southeast quarter of the southeast quarter (40 acres), section 29; southeast quarter of the southeast quarter (40 acres), section 30; northeast quarter of the northeast quarter (40 acres), section 31, and lot No. 5 (48.35 acres), section 29, containing in the aggregate 168.35 acres.

The township map from which the above areas and locations are taken purports to conform to the field-notes of the surveys on file in the surveyor-general's office. It was made in 1884 and bears the certificate of the Department of the Interior, general land office, to the effect that it is a true and correct copy of the plat or survey of the lands to which it relates on file in that office. The section of the township in which the lands in controversy are situate and those adjacent thereto are mountainous, rough and precipitous. The rock formations are so abundant that the surveyors, as shown by their notes, found pit excavations, as a means of indicating section corners, to be impracticable in some places. The land, as such, is listed as being inferior in quality. The country is sharply broken with gulches, ravines, and canyons, and portions of the land are so heavy in brush as to be impenetrable. San Clemente Creek, regarded as an important natural monument, has its source in this locality, and its several branches meander a wide area of country. A few of the ancient monuments were not discoverable, but sufficient in number and position were found to make reasonably certain the location of section and quarter-section lines as originally established. It could not reasonably be expected under the circumstances of the situation that accuracy as to courses and distances, or as to the establishment of section or quarter-section monuments would mark the results of the surveyor's efforts or that pits dug more than fifty years prior to the recent surveys would continue, in all cases, to remain open.

The complaint, in describing said lot 6, does so by reference to certain monuments, courses, and distances, and alleges it to contain 81.66 acres. Defendant's claim of ownership of said 39.05 acres, as set forth in his answer, is placed upon the open, notorious, uninterrupted, exclusive, and adverse possession and claim of ownership of himself and his predecessors in interest for a period of more than twenty years immediately prior to the commencement of the action and "upon a written instrument purporting to convey said real property." As a further defense to the action the bar of the provisions of the Code of Civil Procedure, sections 318 to 325 (omitting section 320), both inclusive, and section 343 are separately pleaded. The trial court found that plaintiffs were the owners in fee simple of said lot 6 described in the complaint as containing 81.66 acres, and

found that none of the allegations of defendant's answer and separate defense were true. Judgment was accordingly entered in favor of plaintiffs.

The principal matter for determination of the trial court was the ascertainment of the actual acreage contained in said lot number 6, notwithstanding the fact that said township map, which purports to have been made conformable to the field-notes of early surveys of sections 29, 30, 31, and 32 and upon which said lot 6 is marked as containing 42.81 acres. Said early surveys were made by deputy United States surveyors in chronological order as follows: F. L. Ripley, 1872; John Gilchrist, 1877; John D. Hall, 1882–83. Field-notes of the survey of the Rancho San Francisquito, which partly lies in sections 19, 30, and 29, as made and recorded by James E. Terrill in 1859, and a resurvey of said rancho made by Lou D. Hare in 1903–4, are also carried into the record. The last survey made of portions of sections 29 and 30 and upon which survey respondents rely to establish the claim that the figures "42.81," representing acreage as indorsed upon said map, was erroneous and said lot at all times contained 81.66 acres, was made by William Davies in 1923. In addition to the introduction in evidence of the field-notes of said surveys considerable oral evidence was taken.

It is not claimed that lot 6, when granted to Jonathan Roberts by patent in 1875 was, according to the original survey, in the irregular shape which it must assume if defendant's claim should be sustained. The southerly boundary line, as shown upon the plat made from the field-notes of surveyor Ripley, is a straight, unbroken line, while, if defendant prevails according to his contention, it would begin at the 4x4 inch post marked "¼ S. 29 S. 30 S." running thence east 890 feet, thence south 22 degrees 30 minutes east 425 feet, thence east 475 feet to a point, thence south, etc. It is the claim of defendant, however, that the line which originally marked the southerly boundary of lot 6 has been dropped so as to include the 40 acres lying contiguous to it on the south. From an inspection of the map made from the Ripley field-notes it is very apparent that there has been no dropping of said line. By a comparison of the easterly line of said lot 6 with the other lines of said lot it is obvious that in the shape as platted it could not have contained more than

about the acreage shown upon its face, to wit, 42 acres. In order to give it the added acreage contended for by respondents the fence line which marks the southerly limits of the Rancho San Francisquito rather than the grant line as indicated by the Ripley survey must be taken as the common boundary line of said rancho and lot 6. The acreage lying between the fence line of said rancho and the line shown by the Ripley survey as being the boundary line of said rancho practically accounts for the excess which forms the basis of the claim of the respective parties to the suit. Surveyor Davies surveyed the land upon the ground in order to determine the location and acreage of lot 6. Undoubtedly the original monument establishing the common corner of sections 29, 30, 31, and 32 was plainly distinguishable and was accepted by him as such corner. It consisted of a post placed in a rock mound. Besides, there was parol evidence to the effect that it was accepted by Mr. Culp, his predecessors in interest, and, in fact, was commonly regarded by others as the ancient monument marking the section corner. With the aid of the government field-notes, the verity of which was confirmed by the actual discovery of monuments, connections were made with other section corners of the township, thus enabling the surveyor to reproduce the exterior boundaries of said section. Thus the common corner of sections 25, 30, 36, and 31 was verified. On the line dividing sections 29 and 30, north 30 degrees west, 2,630 feet from the common corner of sections 29, 30, 31, and 32, another old rock mound bearing indications of a post having formerly been placed in it, and which agreed with the field-notes, was discovered and accepted as the quarter-section corner. The distance between this quarter and the section corner was divided and a 4x4 inch post set as marking the southwesterly corner of lot 6. The newly marked point was 50 or 60 feet east of an old fence built parallel with the section line, but which was not connected with any other fence. From the last-named point the witness proceeded to the quarter corner between sections 20 and 29 and there found a post and a government bearing tree, which corresponded with the calls of the government field-notes. This point was connected with the common corner of sections 20, 21, 28, and 29, which was evidenced by four bearing trees. The old post was found lying on the ground and it was reset. The dis-

tance from the section corner to the quarter-section meas-
ured 2,640 feet. From the section corner the surveyor ran
south along the section line between sections 28 and 29 to
an "old line tree." A projection of the section line from
this point south 25 chains (according to the original field-
notes) would, or should, connect the northeast and south-
east sections' corners of section 29. The position of the
common corner of sections 28, 29, 32, and 33 and the length
of the southerly line of section 29 was obtained by travers-
ing. The distance of the southerly boundary line of sec-
tion 29 was calculated to be 6,100 feet, and, therefore,
contained an excess of 820 feet. This excess was appor-
tioned between the quarter-sections by allotting to each an
additional width of 205 feet.

The length of the west line of section 19, according to
the field-notes of the Ripley survey, is given as 50.2 chains
or 3,313.2 feet, while the Davies survey shows it to be 4,280
feet, leaving a discrepancy of 969 feet between the two sur-
veys. The excess, as shown by the Davies survey, exists
in that portion of the section line lying north between the
quarter-section line and the point at which said line cuts
into the southerly line of the San Francisquito Rancho.
The quarter-section line extending southerly from said quar-
ter-section point is definitely determinable and precludes the
theory of apportionment south of said lots. The southerly
boundary line of said rancho is also the northerly boundary
line of lot 6 for a distance of about 2,000 feet and connects
the westerly boundary line of said lot (which is also the
westerly boundary line of section 19) with the easterly
boundary line of said lot 6. From the point of intersection
of the westerly line of section 19 with the southerly
boundary line of said rancho, according to the Ripley map,
the course is south 49¼ degrees east. There can exist but
little doubt that the discrepancy in the acreage of lot 6 is
to be accounted for by mistaking the position of the south-
erly boundary line of said rancho. It is very apparent that
the map platted from the Ripley field-notes fixed the south-
erly line of said rancho along the course indicated upon
said map as south 49¼ degrees east and not along the fence
line which Davies established as the southerly boundary
line of said rancho and the northerly boundary of said lot
6. As above stated, by running north to said fence line
the excess acreage is accounted for. If this be true, the

southerly boundary line of said lot 6 remains practically where it was originally fixed and the excess acreage in the northerly portion of said lot would be of no interest to or concern of the defendant. The questions of Ripley mistaking gulches or canyons for the San Clemente Creek or tributaries thereof and the identification of other points were questions to be determined by the trial court, and while there may be room for disagreement as to the conclusion that may be drawn from a number of material matters in controversy we cannot say that the court's findings are without evidentiary support.

[1] It is the invariable rule, early adopted in this state, "that when a piece of land is conveyed by metes and bounds, or any other certain description, all included within those bounds, or that description, will pass, whether it be more or less than the quantity stated in the deed. . . . The quantity being the least certain part of the description must yield to the boundaries or numbers, if they do not agree." (*Stanley* v. *Green,* 12 Cal. 148.) The figures "42.81," entered on the face of the map, must give way to the more definite description, to wit, lot 6, and its boundaries having been defined by the court, will control as to the quantity of land contained in said lot.

[2] We have considered the claim of ownership by prescription and adverse possession made by defendant and think that he has not sustained either issue. He received the full acreage of his purchase measured by whatever rule may be applied to the situation. Neither appellant nor his predecessors paid taxes upon any portion of the land in controversy, nor has his possession, which was but three years' duration, or the possession of his predecessors in interest, been of the kind and character which the law requires in order to transfer the title of real property. Plaintiffs and their predecessors have paid taxes upon said lot 6, whatever its acreage may be. We have examined the entire record, including all the evidence in the case, and feel satisfied that the trial court committed no prejudicial error.

The judgment is affirmed.

Richards, J., Shenk, J., Curtis, J., Lennon, J., Lawlor, J., and Waste, C. J., concurred.