[Civ. No. 28156. First Dist., Div. One. Dec. 2, 1971.]

OSBORNE WHITE et al., Plaintiffs and Respondents, v.
THE STATE OF CALIFORNIA, Defendant and Appellant.

## COUNSEL

Thomas C. Lynch and Evelle J. Younger, Attorneys General, Charles A. O'Brien, Chief Deputy Attorney General, Jay L. Shavelson, Assistant Attorney General, Bertram G. Buzzini, N. Gregory Taylor and Jerold A. Krieger, Deputy Attorneys General, for Defendant and Appellant.

Landels, Ripley & Diamond, Edward D. Landels and Earl M. Ripley for Plaintiffs and Respondents.

Bruce A. Beckman as Amicus Curiae on behalf of Plaintiffs and Respondents.

## OPINION

**ELKINGTON, J.**—An appeal is taken by the State of California from a judgment in favor of plaintiffs Osborne and Aileen White which quieted title to 38 acres of valuable tidelands of Petaluma River (sometimes called Petaluma Creek). ██ Tidelands are the "land lying between the ordinary high and low tide lines." (*People* v. *California Fish Co.,* 166 Cal. 576, 583 [138 P. 79].) The plaintiffs claimed title through a patent issued to their predecessors in interest by the State of California.

### I. *The Case*

At the point where Petaluma River flows over the subject tidelands two or three miles upstream from San Francisco Bay, the river historically has been subject to tidal action of the Pacific Ocean, and therefore constitutes tidewater. It is "an arm of the bay" and since 1853 has been declared by law to be a navigable stream. (Compiled Laws of California, 1850-1853, ch. CXCVII, p. 916; Har. & Nav. Code, § 104.) It has also been navigable in fact; as recently as 1965, according to a publication of the United States Army Corps of Engineers, January 1, 1967,

Water Resources Development in California,[1] 305,000 tons of freight were carried on the river.

In 1870 one John Reagan filed an application for a patent to a "certain tract of swamp and overflowed land being Salt Marsh Land in Sonoma County, lying and situate on the North side of Petaluma Creek being the Second Island below the mouth of San Antonio Creek." The island had been topographically surveyed in 1860. The relevant portion of this survey is depicted as "Figure One," page 744, *infra*. The typewritten markings have been added by us. It will be noted that the main channel of Petaluma River flowed (and still does) off the southwesterly shore of the island, and as indicated, the outlined area of the river which loops around into "Rush Creek" and "False Bay" traces the *low tide lines*. Also noteworthy is the fact that the island's northerly, easterly, and southerly sides merge into shallow "saltmarsh tidelands."

Reagan's patent application was made under the authority of "An Act to provide for the management and sale of the lands belonging to the State," Part II of which related to the sale and reclamation of "swamp and overflowed, salt marsh and tidelands." (Stats. 1867-1868, ch. 415, p. 507—herein called "the Act.") A condition of such a patent was that the applicant reclaim the land. The statutory cost to the applicant was $1.00 per acre. The Act provided that the county surveyor must .survey the desired land, his survey thereafter to be submitted for approval to the state's Surveyor General.

As provided by the Act the Sonoma County surveyor thereafter surveyed the island in 1871, following which a record of the survey was submitted to the state Surveyor General for approval. It was called "Swamp and Overflowed Lands Survey No. 58" (hereinafter S & O Survey #58). S & O Survey #58 placed the starting point of its subject land's boundary as "Beginning at a stake set in a bed of broken glass bearing N 59½ W from the center cor [*sic*] to section 33 distant 2384 chs." (The stake and the bed of broken glass have vanished with time; they cannot be found.) There followed 31 counterclockwise zig-zag calls of courses and distances, which finally closed the survey's plat at the point of beginning.

Also on the recorded survey the county surveyor sketched the survey's perimeter plat, its courses and distances, and its relation to Petaluma River and to sections 3, 4, 33 and 34, "Base and Meridian of Mount Diablo." A copy of the survey's sketch is to be found on "Figure Two," page 746, *infra*. The survey's plat, the river, and sections 3, 4, 33 and 34,

---

[1]Of which judicial notice may be taken—see Evidence Code sections 451, 452.

Figure One

are as they appear in the original; for clarity we have superimposed certain captions and markings.

It will be noted that the survey's plat is firmly anchored on its southerly side to the southerly line of section 3, and on its easterly side to the easterly line of section 3 and the southerly line of section 34. It will also be observed that the survey's plat is bounded partially on the north by "Tide Land Corrected Survey No. 21," and on all remaining landward sides by "Swamp and Overflowed Lands Survey No. 15."

It is also notable that the starting point of the survey's calls, the "stake set in a bed of broken glass," was at the point of the most westerly projection of the plat, which was also one of the points of a southwesterly call of Tide Land Corrected Survey No. 21. And a comparison of the topographic survey of Figure One with the plat of Figure Two will disclose that much salt marsh tideland to the north and east, and probably to the south, was included within the limits of S & O Survey #58.

A patent to the land embraced by S & O Survey #58, executed by the state's Governor, was issued to Reagan's successors in interest in 1880. It followed exactly the calls and courses and distances of the survey.

Plaintiffs' claim rests upon the 1880 patent. The disputed 38 acres of tidelands are somewhere in the area shown at Figure One immediately above the word "River."

Firmly established at the trial was the fact that the boundaries of the many patents along the northeasterly bank of Petaluma River fitted together closely, somewhat on the order of the common jigsaw puzzle. They were tied into several sections, in our case the lines of sections 3 and 34, as established in relation to Mount Diablo Base and Meridian (see Figure Two). Plaintiffs' witnesses generally conceded, indeed insisted, that the several patents "fit together," that adjoining boundaries were "identical," that "58 and 21 joined" and that they were "all part of one solid map," the "whole figure [of which] is rigid, fits in there and there and goes on down around San Pablo Bay." It is emphasized by the same witnesses that S & O Survey #58 closely dovetailed with its nearby surveys. They said "the entire area of the survey all fit together as described in the patent." The contention continues in plaintiffs' briefs on appeal; strangely, in light of the evidence produced and relied upon by them, they say, "The contention that Survey 58 can be moved around (and courses changed) so as to put its boundaries where one would like to see them is the kind of 'surveying' nonsense which has bedevilled this controversy from the beginning."

With the courses and distances of S & O Survey #58 fixed on the earth's surface, the patent's riverside boundary's angular calls are found to approximately follow the ordinary high tide mark. *The disputed tidelands are located outside of the patent's plat.*

This state of affairs would reasonably seem to indicate an intent of the county surveyor not to include this property in his survey. But plaintiffs' expert witnesses Passarino and Robinson testified otherwise. From their involved studies they concluded that the county surveyor *intended* to

Figure Two

locate the subject tidelands *within* his survey lines. Passarino offered his own survey in which he had *changed* 22 of the 31 calls of S & O Survey #58. This *amended* survey went out into the river and embraced the 38 acres of tidelands sought by plaintiffs. Robinson also made a survey. He testified that he positioned his survey in the same manner as did Passarino; he said "the two surveys [his and Passarino's] do fit together." Both witnesses testified that the altered surveys were as really *intended* by the county surveyor in 1871.

The changes of the survey lines which would add the 38 acres of riverfront tidelands to plaintiffs' acreage may best be illustrated by a comparison of S & O Survey #58 with the Passarino survey. (We have shown the points of difference by heavy black type.)

| County Surveyor's Call Number | S & O Survey # 58 Courses | Distance in Feet | Passarino Survey Courses | Distance in Feet |
|---|---|---|---|---|
| 26 | N 57° W | 1089.66 | N 56° 37' 10" W | 1089.78 |
| 27 | S 43° 30' W | 1168.86 | S 43° 50' 30" W | 1167.78 |
| 28 | S 74° 30' W | 1230.24 | S 74° 52' W | 1229.44 |
| 29 | N 82° W | 1825.56 | N 81° 27' 30" W | 1825.00 |
| 30 | S 87° W | 429.00 | S 87° 22' 20" W | 428.79 |
| 31 | S 22° W | 256.08 | S 22° 19' 10" W | 255.84 |
| 1[2] | S 34° 30' E | 574.86 | S 34° 13' 20" E | 574.58 |
| 2 | S 70° 45' E | 426.36 | S 70° 28' 50" E | 426.42 |
| 3 | S 34° E | 366.30 | S 33° 43' 30" E | 366.12 |
| 4 | S 43° 45' E | 762.96 | S 43° 28' 40" E | 762.72 |
| 5 | S 45° E | 822.36 | S 44° 43' 40" E | 822.12 |
| 6 | S 72° 30' E | 1219.68 | S 72° 13' 50" E | 1219.86 |
| 7 | S 23° 45' E | 1190.64 | S 23° 28' E | 1189.89 |
| 8 | S 65° 30' E | 491.04 | S 65° 13' 50" E | 491.06 |
| 9 | S 32° E | 1074.48 | S 31° 43' 20" E | 1073.94 |
| 10 | S 62° 30' E | 1693.56 | S 62° 13' 50" E | 1693.54 |
| 11 | S 17° 45' E | 645.48 | S 17° 27' 50" E | 645.03 |
| 12 | S 22° 30' W | 726.66 | S 22° 49' 10" W | 725.96 |
| 13 | S 26° 30' E | 1059.96 | S 26° 13' 10" E | 1059.34 |
| 14 | S 40° W | 330.00 | S 40° 20' 20" W | 329.69 |
| 15 | S 8° 30' W | 330.66 | S 8° 48' 30" W | 330.36 |
| 16 | S 25° 45' E | 505.56 | S 25° 28' 10" E | 505.26 |

[2]This is the starting point of the county surveyor's calls, the "stake set in a bed of broken glass."

It will be observed that the county surveyor's calls numbered 26 through 31 constituted the common boundary of S & O Survey #58 with Tide Land Corrected Survey No. 21. Passarino's alterations of this boundary would, of course, change the lines of Tide Land Corrected Survey No. 21, and deliver land covered by that survey to the plaintiffs, or to whomsoever now owns the northerly shore of the island. Later, questioned about this, plaintiffs' witnesses said, "The only one that was not a fairly true fit was 58." Unexplained was how Tide Land Corrected Survey No. 21 could in this manner be pushed northward without disrupting the lines of other patents, and they in turn, still others. As the witnesses had said, speaking of the area's patent complex, "this whole figure is rigid, fits in there and there and goes down around San Pablo Bay."

Passarino explained why he concluded that it was the county surveyor's *intent to* meander the river's ordinary low tide line. He said that S & O Survey #58 recited that 934.65 acres were contained within its delineations, while in fact it embraced only about 888 (or 850) acres. In order to reconcile this difference in acreage, the meander line "just has to go out to the low water, otherwise, the acreage is short." So he had to go "outside the boundary described in the patent." Since the patent's nonriver boundaries were tightly fixed and could not be changed, the river's low water mark "is the only place I know of that the area could be balanced, would have to lie in this area between the described patent line and the edge of Petaluma Creek." He reiterated that he had *moved* the riverward boundary of S & O Survey #58 to the low tide line "as a result of determining the acreage" and for "the purpose of computing acreage."

Called to the stand again later in the trial Passarino repudiated his reason why he believed the county surveyor intended the river's low tide line as the boundary of his survey. The following questions were asked and answers given. "Q. Now one or two more questions. In locating the southwesterly boundary of swamp and overflow Survey 58, that is running courses and distances in the survey, you paid no attention to acreage, did you? A. That's right. This is entirely independent. This is the mathematic position of bearings and distances in the patent. Q. Without regard to acreage? A. That is right." The new reason, "the mathematic position of bearings and distances in the patent" was never made clear; at least it is not made clear to us.

Passarino also gave the following testimony: "Q. Now there are located in this area between the line that you have marked A and the line that you have marked B, five swamp and overflow patents, are there not? 15, 62, 58, 45 and 35? A. Right. Q. And together with a tideland patent

21 encompasses the entire area? A. Yes, sir. Q. And any of those, in any of them you plotted them all, have you not? In any of them did they use your ordinary high water mark as the outward boundary? A. No, they did not."

Robinson testified to the same effect: "Q. Assuming the map to be accurate, you have examined all of the other surveys located in this general area? A. Yes, I have. Q. And plotted them, more or less? A. Yes. Q. Do any of these boundaries at any point purport to follow the mean high tide line as it appears on this map? A. No, they do not, sir."

It bears emphasis that neither the survey nor the patent was uncertain or ambiguous; it was not so contended at the trial nor is it so contended here. This accord undoubtedly results from a recognition of the long-existing rule that a public grant's angular calls of courses and distances bounding land fronting on tidewater (absent a contrary intent expressly shown by the grant), as a *matter of law* meanders the ordinary high tide line. (Civ. Code, § 830; *Hardin* v. *Jordan,* 140 U.S. 371, 380-384 [35 L.Ed. 428, 432-434, 11 S.Ct. 808, 838]; *Stillwell* v. *Jackson* (1936) 5 Cal.2d 165, 169 [53 P.2d 752]; *Los Angeles* v. *San Pedro etc. R.R. Co.,* 182 Cal. 652, 653-656 [189 P. 449]; *Curtis* v. *Upton,* 175 Cal. 322, 334 [165 P. 935]; *De Watson* v. *San Pedro etc. R.R. Co.,* 169 Cal. 520 [147 P. 140]; *Bouchard* v. *Abrahamsen,* 160 Cal. 792, 798-799 [118 P. 233]; *Den* v. *Spalding,* 39 Cal.App.2d 623, 627, 633 [104 P.2d 81]; *City of Los Angeles* v. *Duncan,* 130 Cal.App. 11, 14 [19 P.2d 289]; 12 Am.Jur.2d, pp. 573-575; 11 C.J.S., pp. 572-575.) In their briefs on this appeal plaintiffs reiterate—"There is nothing uncertain or ambiguous in either the survey or the patent."

## II. *The Issue*

Amplifying their concession that S & O Survey #58 and its related patent are not ambiguous, plaintiffs now urge *"that the problem before the lower court was not one of construing the patent or the survey but that of locating the boundaries recited in the patent and in the survey."*

Plaintiffs do not correctly state the issue before the superior court, and now before us. It is true that the issue was not "one of construing the patent or the survey" for the meaning of those documents was clear; their meandering riverbank courses and distances did *not* enclose the disputed tidelands, while their remaining calls neatly conformed to the boundaries of sections 3 and 34 and the adjacent surveys. (See Figure Two, *supra.*) But the issue also was *not* "that of *locating the boundaries recited in the patent and in the survey."* Any attempt to *locate* or *relocate* those lines riverward

would *dislocate* several miles of fixed coterminous boundaries; the patent's most easterly boundary would be wrenched from the line of section 3 leaving a sort of no man's land of several hundred feet with a corresponding maladjustment all around the patent's sides. Plaintiffs actually make no argument that they seek to move the fixed plat of S & O Survey #58 to a different place on the earth's surface; indeed they say that this is what one of the State's theories would do.

Plaintiffs would better state the issues posed by them as whether, without disturbing any of the present land coverage of the patent, certain of its boundary lines can be expanded outward to include an additional 38 acres of tideland. This would not be a *locating* of the patent's boundaries; but rather an *altering* of some of them for the purpose of *enlarging* the area contained by all of them. No other possible interpretation can be given the *revised* courses and distances of Passarino's and Robinson's proffered surveys, and their testimony about going *outside* the patent's boundaries in order to give effect, not to the county surveyor's explicit recorded survey, but to his "intent."

The issues might be even more simply stated as: (1) did the county surveyor intend to locate the riverward boundary at the low tide line (a question of fact), and, if he did so intend, (2) are the patent's boundaries to be extended accordingly (a question of law).

### III. *The Findings*

 Resolving the issues, the trial court stated that it *accepted Passarino's "survey and positioning of S & O #58"* (italics added) and then made its finding that: "The courses and distances of the southwesterly boundary of the lands described in said patent were in the nature of a meander line and *were intended to and did meander the ordinary low water line of* Petaluma Creek on the northeasterly side thereof." (Italics added.)

We have concluded that this finding is unsupported by substantial evidence, and that the judgment, on that factual ground, and on other legal grounds, must be reversed. Our reasons follow.

### IV. *The Intent of the County Surveyor*

As must by now be clear, the trial concerned in its near entirety, not the actual fixed boundaries of S & O Survey #58 and the patent, but instead the *intent* of the county surveyor when he established those boundaries. Little heed was paid to the *intent* of the state in issuing the patent.

Under the Act the county surveyor was designated as the person to prepare a survey of the land sought to be purchased and patented under

its provision. (See § 23 of the Act.) He had no further function in the land patenting process. It was the state Surveyor General to whom authority to approve the survey was given (§ 10). Upon his approval and the applicant's compliance with the Act, a patent was signed and issued by the Governor. (§ 10.) Elementary logic would seem to indicate that the land patented by the state was the land applied for and covered by the survey as recorded. Certainly the state may not reasonably, or legally, be considered bound by some *undisclosed intent* of the county surveyor to include additional land in his survey.

It is established law that the delineations of a survey and state patent are the measure of the patent's boundaries and of the patentee's (and his successor's) rights. This is true even where the lines were intended to have been and should have been (as here contended) placed elsewhere.

"[A] patentee takes only such land as is included within the survey of the plot conveyed and he cannot later question the survey as erroneous, although in fact the line in question should have been placed elsewhere." (*Phelps* v. *Pacific Gas & Elec. Co.,* 84 Cal.App.2d 243, 247 [190 P.2d 209].)

*De Guyer* v. *Banning,* 91 Cal. 400 [27 P. 761], concerned an issue somewhat similar to that before us. It was contended that a state patent's boundaries did not conform to the statutory proceedings leading to its issuance. The court held (p. 402) that when a survey has been made, approved, and acted upon by the state, its correctness may not "be impeached or disregarded in an action of ejectment, and that, too, by one who claims under the very proceedings of which the survey was one essential part." Quoting even earlier California authority the court (p. 403) said: " 'A patent issued under the act of 1851 is, as has often been held by this court, the final act in proceedings instituted for the confirmation of the claim of the patentee to land which had been granted by the former government, and for the segregation of such land from the public lands of the United States; and it is a record which binds both the government and the claimant, and cannot be attacked by either party, except by direct proceedings instituted for that purpose. (*Leese* v. *Clark,* 18 Cal. 535.) While it stands, the claimant, or those deriving title through him, will not be permitted to aver that the claim comprised other or different lands from those mentioned in the patent. . . . The patent purports to convey the lands described in the survey, and its scope cannot be extended, nor on the other hand can it be limited by showing that the decree comprised a greater or less area than the survey. Nor can the claimant, after admitting —as he must—the conclusive effect of the patent, make out title to lands not conveyed by the patent, by the production of the proceedings which culminated in the patent. The patent, while it remains in force, conclu-

sively determines what lands the claimant was entitled to under his claim and the decree of confirmation.' "

On certiorari the United States Supreme Court (*De Guyer* v. *Banning,* 167 U.S. 723, 744 [42 L.Ed. 340, 347, 17 S.Ct. 937]) approved the holding of *De Guyer* v. *Banning, supra,* 91 Cal. 400, stating: "In our opinion the adjudged cases and the evidence in the cause leave no room to doubt the soundness of the conclusions announced by the Supreme Court of the State, namely: . . . The patent having been accepted by the patentees, and being uncancelled, the plaintiffs in this action, claiming under the patentees, cannot recover lands not embraced by it, even if such lands are embraced by the lines established by the decree of confirmation —*the conclusive presumption being that the patent correctly locates the lands covered by the confirmed grant.*" (Italics added.)

The rule under discussion was tersely summarized by the court in *Verdi Dev. Co.* v. *Dono-Han Mining Co.,* 141 Cal.App.2d 149, 152 [296 P.2d 429], in this manner: "The original government surveys, whether they are mathematically correct or grossly erroneous, control the location and length of boundaries of sections and parts thereof and the shape and size of tracts granted to patentees."

It follows that the superior court erred in adjudging that plaintiffs, basing their claim on the patent, took land thereby which was outside of the patent's boundaries.

## V. Civil Code Section 830, and the Common Law

As we have pointed out, while the patent *does expressly* grant certain salt marsh tidelands on its northerly, easterly, and southerly sides, it *does not expressly* grant the tidelands of the navigable river on its southwesterly side.

Another long-standing pertinent rule is that title to tidelands will pass to the state's grantee only when the instrument of conveyance *expressly so states on its face.* Without such an express provision the grantee of lands facing on tidewater takes only to the ordinary high tide line.

The rule has been codified in California by the enactment of Civil Code section 830. This section, as pertinent here, provides: "Except where the grant under which the land is held indicates a different intent, the owner of the upland, when it borders on tidewater, takes to ordinary high water mark; . . ."

Section 830 is a codification of the common law rule. (See *Hardin* v.

*Jordan, supra,* 140 U.S. 371, 384 [35 L.Ed. 428, 434]; *Drake* v. *Russian River Land Co.,* 10 Cal.App. 654, 660 [103 P.167].)

As recently as February 1970, this state's Supreme Court stated: "Among the statutory provisions favoring public ownership of shoreline areas is Civil Code section 830. That section states that absent specific language to the contrary, private ownership of uplands ends at the high water mark." (*Gion* v. *City of Santa Cruz,* 2 Cal.3d 29, 42 [84 Cal.Rptr. 162, 465 P.2d 50].)

The earliest assertion of the common law rule brought to our attention is found in *Martin* v. *Waddell* (1842) 41 U.S. (16 Pet.) 367 [10 L.Ed. 997]. That case involved a dispute over navigable tidelands in the State of New Jersey. The proper interpretation of a charter of Charles II to his brother, the Duke of York was at issue. The United States Supreme Court stated (p. 410 [10 L.Ed. p. 1013]): "In such cases, whatever does not pass by the grant, still remains in the crown for the benefit and advantage of the whole community. Grants of that description [lands bounded by "rivers, bays and arms of the sea"] are therefore construed strictly—and it will not be presumed that he intended to part from any portion of the public domain [the tidelands], *unless clear and especial words are used to denote it. . . ."* (Italics added.)

The same court spoke in *United States* v. *Pacheco* (1864) 69 U.S. (2 Wall.) 587 [17 L.Ed. 865], which concerned property bounded "on the west by the Bay of San Francisco." It was said (p. 590 [17 L.Ed. p. 866]): "The position, that by the bay as a boundary is meant, in this case, the line of low-water mark, is equally unfounded. By the common law, the shore of the sea, and, of course, of arms of the sea, is the land between ordinary high and low-water mark, the land over which the daily tides ebb and flow. When, therefore, the sea, or a bay, is named as a boundary, *the line of ordinary high-water mark is always intended where the common law prevails. . . ."* (Italics added.)

*Shively* v. *Bowlby* (1893) 152 U.S. 1 [38 L.Ed. 331, 14 S.Ct. 548], concerned an action to quiet title to tidelands of the lower Columbia River. *Shively* relied upon a patent granting land "bounded by the" river. It was held as a matter of law that the patent granted "no title or right in the land below high water mark." In support of its holding the court declared (pp. 10, 13 [38 L.Ed. 335, 336]): "The familiar rule and its chief foundation were felicitously expressed by Sir William Scott: 'All grants of the Crown are to be strictly construed against the grantee, contrary to the usual policy of the law in the consideration of grants; and upon this just ground, that the prerogatives and rights and emoluments of the Crown being conferred upon it for great purposes, and for the public use, it shall

not be intended that such prerogatives, rights and emoluments are diminished by any grant, *beyond what such grant by necessary and unavoidable construction shall take away.'* . . . [¶] In England, from the time of Lord Hale, it has been treated as settled that the title in the soil of the sea, or of arms of the sea, below ordinary high water mark, is in the King, except so far as an individual or a corporation has acquired rights in it *by express grant,* or by prescription or usage; . . . [¶] It is equally well settled that a grant from the sovereign of land bounded by the sea, or by any navigable tide water, does not pass any title below high water mark, *unless either the language of the grant, or long usage under it, clearly indicates that such was the intention. . . ."*[3] (Italics added.)

California has always followed the common law rule that title to tidelands can pass only by express language therefor in the instrument of conveyance.

*Wright* v. *Seymour* (1886) 69 Cal. 122 [10 P. 323], concerned a patent to land bounded by the meandering bank of the lower Russian River at a point affected by the ebb and flow of ocean tides. Since tidelands were not expressly included in the grant, the court rejected a contention that the patent passed title to the stream bed beyond the high tide line. It was stated: " 'So that in all cases where the land of a private individual is bounded upon sea, *prima facie* the boundary is the shore at ordinary high-water mark.' (Tyler's Law of Boundaries, p. 39.) [¶] 'The same principle which governs the question of boundary of property adjoining the sea applies to arms of the sea, estuaries and navigable rivers below tidewater.' [Citations.] [¶] The lands under water where the tide ebbs and flows belong to the state by virtue of her sovereignty, and *in the absence of an express showing to the contrary,* it will not be presumed that the government of the United States intended to convey it." (Italics added.)

In *Los Angeles* v. *San Pedro etc. R.R. Co., supra,* 182 Cal. 652, the appeal was taken in an action to quiet title to certain tidelands in Los Angeles harbor. The Supreme Court first restated (pp. 654-655) the rule earlier announced in *Wright* v. *Seymour, supra,* as follows: " 'The lands under water where the tide ebbs and flows belong to the state by virtue of her sovereignty, and in the absence of an express showing to the contrary it will not be presumed that the government of the United States intended to convey it. . . . We must assume that the government discharged its obligation to the holder of the Mexican title by receiving proof of its character and the land to which it related, and that upon confirmation the patent issued to the claimant is the evidence and only evidence of the extent of the grant, and the terms used in such patent relating to extent

---

[3]No contention of "long usage" under the patent is here made.

and boundaries are subject to like rules of construction with other grants from the government. Had the government found the claimant entitled to the bed and banks of a tidewater stream, we must suppose it would have used in the patent apt words for its conveyance. Not having done so, the presumption is, that it was not intended to convey the bed of the stream.' "

The court continued (p. 655): "It is equally well settled that a grant from the sovereign of land bounded by the sea or by any navigable tide water does not pass any title below high-water mark *unless either the language of the grant or long usage under it clearly indicates that such was the intention.*" (Italics added.)

*Stillwell* v. *Jackson, supra,* 5 Cal.2d 165, 169, holds that where an instrument grants land bounded by the meander line of the ocean's shore, that "in *the absence of any other declared purpose,* a meander line thus drawn would represent the line of ordinary high tide of the ocean . . . ." (Italics added.)

Some confusion has been engendered by the use of language relating to the rule we have discussed. Thus, in *Abbot Kinney Co.* v. *City of Los Angeles,* 53 Cal.2d 52, 57-58 [346 P.2d 385], it is said "Absent a *showing to the contrary,* the upland owner obtains title only to the high water mark. (Civ. Code, § 830; *City of Los Angeles* v. *San Pedro etc. R.R. Co.,* 182 Cal. 652, 654-655 [189 P. 449]). . . ." A showing to the contrary might possibly be by way of extrinsic evidence. But resort to the cited authority for the stated proposition quickly discloses the meaning to be "Absent [an express] showing [in the grant] to the contrary." As we have pointed out, the cited authority, *Los Angeles* v. *San Pedro etc. R.R. Co.,* held: "It is equally well settled that a grant from the sovereign of land bounded by the sea or by any navigable tide water does not pass any title below high-water mark unless either the language of the grant or long usage under it clearly *indicates that such was the intention.* . . ." (P. 655.)

Similarly, *Gion* v. *City of Santa Cruz, supra,* 2 Cal.3d 29, 42, states: "Among the statutory provisions favoring public ownership of shoreline areas is Civil Code section 830. That section states that absent specific language to the contrary, private ownership of uplands ends at the high-water mark. The decisions of this court have interpreted this provision to create a *presumption* in favor of public ownership of land between high and low tide. (See *Kimball* v. *MacPherson* (1873) 46 Cal. 103, 108; *Upham* v. *Hosking* (1882) 62 Cal. 250, 258; *Long Beach Land & Water Co.* v. *Richardson* (1886) 70 Cal. 206, 209 [11 P. 695]; *Freeman* v. *Bellegarde* (1895) 108 Cal. 179, 185 [41 P. 289]; *People* v. *California Fish Co.* (1913) 166 Cal. 576, 591-596 [138 P. 79]; *Abbot Kinney Co.* v. *City*

*of Los Angeles* (1959) 53 Cal.2d 52, 57 [346 P.2d 385].)" (Italics added.) The third sentence, in which we italicized the word "presumption" may possibly be construed as creating a presumption, rebuttable by contrary evidence *dehors* the grant. The cited authorities show that something in the nature of a *conclusive presumption* was intended. *Kimball* v. *MacPherson* (p. 108) and *Upham* v. *Hosking* (p. 258) state: "Nothing short of a very explicit provision to that effect would justify us in holding that the Legislature intended to permit the shore of the ocean, between high and low-water mark, to be converted into private ownership." *People* v. *California Fish Co.,* is to the same effect; it states that a statute purporting to authorize sale of the state's tidelands will be invalid unless "that intent . . . be clearly expressed or necessarily implied. It will not be implied if any other inference is reasonably possible." (166 Cal. at p. 597.) *Long Beach Land & Water Co.* v. *Richardson* held that since the grant was not in evidence the court was "bound, to presume" that its boundary "went no further seaward than [the] ordinary high-water mark." (70 Cal. at p. 209.) *Freeman* v. *Bellegarde* speaks of no *"presumption"* as to tidewaters, but instead reiterates the rule that a public grant "which is bounded by tidal waters *will be construed* to extend only to high-water mark." (Italics added.) (108 Cal. at p. 185.) We have previously discussed *Abbot Kinney Co.* v. *City of Los Angeles.*

We have been able to find no authority, and none has been presented, which purports to impugn the Civil Code section 830 and common law rule that unless a public grant *expressly* states otherwise on its face, the grantee of land bounded by tidewater takes only to the ordinary high tide line.

Since the patent upon which plaintiffs rely did not *expressly* grant the tidewater on its southwestern boundary, it will be seen that the trial court erroneously failed to apply Civil Code section 830, and the corresponding common law rule.

## VI. *The Parol Evidence Rule*

■ The trial court was presented with an unambiguous patent, the plat and courses and distances of which did not include the tidelands at issue. Parol evidence was admitted for the purpose of showing an intent by the surveyor that the additional 38 acres be enclosed. The trial court on the basis of the parol evidence found such an intent.

We recognize that this parol evidence was not objected to by the State of California; also we observe that no contention is made that the patent itself was on its face reasonably susceptible of an interpretation that the 38

acres of tideland were included with the patent's defined limits (see *Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.,* 69 Cal.2d 33, 40 [69 Cal.Rptr. 561, 442 P.2d 641]). ■ The recent case of *Tahoe National Bank* v. *Phillips,* 4 Cal.3d 11, 23 [92 Cal.Rptr. 704, 480 P.2d 320], has laid to rest the debated question whether evidence, inadmissible as proof under the parol evidence rule but admitted without objection, "as a matter of substantive law . . . [can] serve to create or alter the obligations under the instrument. . . ." Such "irrelevant evidence," the court said, even if not objected to, "cannot support a judgment."

A complete but concise statement of the parol evidence rule as it relates to grants of real property is found in *Pinsky* v. *Sloat,* 130 Cal.App.2d 579, 588-589 [279 P.2d 584]. There the court said: ■ "So far as a deed is intended to pass a right, it is the exclusive evidence of the contract and the parties thereto are concluded by its terms. [Citation.] Where there is nothing ambiguous or uncertain in the terms of a deed it speaks for itself and the inquiry should be limited to what the words of the deed express without regard to any intention independent of those words. [Citations.] ■ The intention of the parties to a grant is to be gathered if possible from the language itself and is determined by a proper construction of the language used rather than by resorting to extrinsic evidence. [Citations.] ■ A deed of trust has the same effect as a deed from the trustor would have had. . . . Where the language of a deed is plain, certain, and unambiguous, the surrounding facts and circumstances will not be considered. [Citations.] ■ [¶] Parol evidence is not admissible to add to, detract from, or vary the terms of a deed. [Citations.] The estate granted by a deed cannot be limited or qualified by oral testimony. [Citations.] ■ The operation of a deed cannot be defeated by parol evidence of an intention on the part of the grantor that it should have an effect different from that apparent on its face. [Citations.] [¶] ■ The parol evidence rule is not a rule of evidence but is one of substantive law. ■ As applied to contracts, the rule is that as a matter of substantive law the act of embodying the complete terms of an agreement in writing becomes the contract of the parties. As a matter of law, the writing is the agreement. Extrinsic evidence is excluded because it cannot serve to prove what the agreement was, this being determined as a matter of law to be the writing itself. ■ The rule is operative when there is a single and final memorial of the understanding of the parties. [Citations.] Parol evidence, though admitted without objection, must be ignored as of no legal import, and its incompetency to vary a written contract is a matter of law. [Citation.]"

Referring to governmental patent grants, California's Supreme Court has expressed the rule in this manner: "It is undoubtedly true, and supported by abundant authority, that when the description of a granted tract

of land embraced within the terms of a United States patent is, upon the face thereof, clear and unambiguous, such description constitutes the final word, and in such case evidence will not be admissible to show that the grantor intended to do other than that thus clearly set forth upon the face of the grant." (*Broome* v. *Lantz,* 211 Cal. 142, 150-151 [294 P. 709]; and see authority there cited.)

The United States Supreme Court, adopting language of *Chipley* v. *Farris,* 45 Cal. 527, 538, has stated that " 'A patent . . . is a record which binds both Government and the claimant, and cannot be attacked by either party, except by direct proceedings instituted for that purpose. . . . While it stands, the claimant, or those deriving title through him, will not be permitted to aver that the claim comprised other or different lands from those mentioned in the patent. . . . The patent purports to convey the lands described in the survey, and its scope cannot be extended, nor, on the other hand, can it be limited, by showing that the decree comprised a greater or less area than the survey. Nor can the claimant, after admitting—as he must—the conclusive effect of the patent, make out title to lands not conveyed by the patent, by the production of the proceedings which culminated in the patent. The patent, while it remains in force, conclusively determines what lands the claimant was entitled to under his claim and the decree of confirmation. The claimant can neither reform the patent nor show that it is in any respect incorrect, in an action of ejectment.' " (*De Guyer* v. *Banning, supra,* 167 U.S. 723, 743 [42 L.Ed. 340, 346-347].)

■ It follows that plaintiff's extrinsic evidence of intent was irrelevant, and "as a matter of substantive law" could not serve to enlarge the boundaries of the unambiguous patent.

## VII. *Substantial Evidence?*

We now inquire of the record whether there was substantial evidence in support of the trial court's finding that *in fact* the county surveyor did *intend* to include the disputed tidelands.

■ The substantial evidence rule holds that when a court's finding or a jury's verdict is attacked on the ground that it is not sustained by the evidence, the power of an appellate court begins and ends with the determination whether there is any substantial evidence, contradicted or uncontradicted, which will support the verdict. Questions of credibility must be resolved in favor of the fact finder's determination, and when two or more inferences can reasonably be drawn from the evidence, a reviewing court may not substitute its deductions for those of the trier of fact. If on any material point the evidence is in conflict, it must be assumed that the court or jury resolved the conflict in favor of the prevailing party.

(*Green Trees Enterprises, Inc.* v. *Palm Springs Alpine Estates, Inc.,* 66 Cal.2d 782, 784 [59 Cal.Rptr. 141, 427 P.2d 805]; *Treadwell* v. *Nickel,* 194 Cal. 243, 260 [228 P. 25].)

Nevertheless, the court in *Herbert* v. *Lankershim,* 9 Cal.2d 409, 471-472 [71 P.2d 220], discussing the rule stated: "There, must be more than a conflict of mere words to constitute a conflict of evidence. The contrary evidence must be of a substantial character, such as reasonably supports the judgment as applied to the peculiar facts of the case. The rule announced in *Morton* v. *Mooney et al.,* 97 Mont. 1 [33 Pac. (2d) 262], correctly states the rule which has been approved by this court in a number of our decisions. It is thus stated: 'While the jurors [here the trial court was the trier of fact] are the sole judges of the facts, the question as to whether or not there is substantial evidence in support of the plaintiff's case is always a question of law for the court (*Grant* v. *Chicago etc. Ry. Co.,* 78 Mont. 97 [252 Pac. 382]), and in determining this question "the credulity of courts is not to be deemed commensurate with the facility and vehemence with which a witness swears. 'It is a wild conceit that any court of justice is bound by mere swearing. It is swearing creditably that is to conclude the judgment.' " ' "

And speaking of "substantial evidence" the court in *People* v. *Bassett,* 69 Cal.2d 122, 138-139 [70 Cal.Rptr. 193, 443 P.2d 777], said: "[W]e emphasized in *Estate of Bristol* (1943) 23 Cal.2d 221, 223 [143 P.2d 689], that 'The critical word in the definition is *"substantial"*; it is a door which can lead as readily to abuse as to practical or enlightened justice.' Seeking to determine the meaning of 'substantial' in this connection, the court in *Estate of Teed* (1952) 112 Cal.App.2d 638, 644 [247 P.2d 54), canvassed dictionary and judicial definitions and concluded that the term 'clearly implies that such evidence must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with "any" evidence. It must be reasonable in nature, credible, and of solid value; it must actually be "substantial" proof of the essentials which the law requires in a particular case.' "

■ Applying the foregoing rules we must and do, and for the reasons we now state, conclude that quite apart from the applicable rules of law we have discussed there was no substantial evidence in support of the trial court's critical finding of fact as to the county surveyor's *intent.*

*The Witnesses Passarino and Robinson*

■ "[T]he weight to be given to the opinion of an expert depends on the reasons he assigns to support that opinion." (*Gazzera* v. *City and County of S.F.,* 70 Cal.App.2d 833, 838 [161 P.2d 806]); its value

" ' "rests upon the *material* from which his opinion is fashioned and the *reasoning* by which he progresses from his material to his conclusion. . . ." ' " (*People* v. *Coogler,* 71 Cal.2d 153, 166 [77 Cal.Rptr. 790, 454 P.2d 686].) ▮ Such an opinion is no better than the reasons given for it (*San Diego Gas & Elec. Co.* v. *Sinclair,* 214 Cal.App.2d 778, 783 [29 Cal.Rptr. 769]), and if it is "not based upon facts otherwise proved, or assumes facts contrary to the only proof, *it cannot rise to the dignity of substantial evidence.*" (Italics added; *Estate of Powers,* 81 Cal.App.2d 480, 485-486 [184 P.2d 319]; *Sears, Roebuck & Co.* v. *Walls,* 178 Cal. App.2d 284, 289 [2 Cal.Rptr. 847].)

We have closely studied the trial record of the witness Passarino's testimony. It reveals that, although expressed many ways, the *only* reason given for his conclusion that the county surveyor intended the low tide line as his riverward boundary, was that it was *"the only place where I know, in my opinion, that there is sufficient area to come anywhere close to the patent amount that was granted. . . ."* This, it is now conceded, is entitled to no evidentiary weight whatever.

It is true that Passarino later withdrew that reason, saying that he had really "paid no attention to acreage"; instead, the "reason" for his conclusion became *"the mathematic position of bearings and distances in the patent"* without regard to acreage. But Passarino's testimony nowhere suggests how, or in what manner, the "mathematic position of bearings and distances in the patent" could or did reasonably indicate the county surveyor's intent to draw his southwesterly lines other than as he did.

Passarino's opinion evidence was no better than his reasons for it, it was not substantial evidence.

We now consider the testimony of the witness Robinson, a title insurance company employee. Unlike Passarino he said he was not "too concerned with acreage." Preparing to testify about plaintiffs' riverward boundary he began looking through "title records seeking old deeds." He came to *"the conclusion"* that a point by Lakeville Road (apparently several miles from the island) "was a *reasonably good position"* to start. So he said, "I started searching, going back and forth until I found the line here *that seemed to line up* with my record." He was led to *"believe"* that [his] positioning was *relatively* close to what the people had been doing with the land." He then "plotted in the rest of the S & O's and there is where it fell, *somewhere in the vicinity of this line* [the river's low-water line]." In his computations he *"did find errors that would cause* [him] *to shift one way or another* and [he] did try to reconcile them [apparently without success]." *Things "didn't quite fit here or there,* and the dimensions were minor, 10 or 20 or 50 feet, something of that nature." One of the

errors appears to have been where the Petaluma Rancho line on which he relied *"doesn't meet."* The errors apparently presented little difficulty for the witness said, *"I just allowed errors to fall there"* at the river line. All of this caused him to *"feel* now [I am] *relatively close* to where *I believe* the original surveyor *must* have set his corners." (The italics of this paragraph are ours.)

The last mentioned guarded statement of the witness seems particularly interesting. After his ambiguous meanderings from a point several miles away during which he resolved all perplexing questions in favor of plaintiffs, he *"felt"* he was *"relatively close"* to where he *"believed"* the surveyor *"must"* have set the line. Since we are dealing with the "relatively" short distance between the island's low and high tide lines, after the witness' study of several miles of uncertain courses and distances, the witness was also "relatively close" to the island's high tide line.

Continuing his testimony, the witness said it "would *appear* to me that [the county surveyor] was working out to the visible water as it would normally be used by a boat," and that other "people were visibly looking at the creek and that he, *perhaps,* did also." The witness concluded that the original surveyor "was attempting to follow what appears to be the *main channel of the Petaluma Creek"* where the water was *"6, 12 and 18 feet"* deep and well beyond even the low tide line. (Italics added.)

If one were to consider credible this witness' conclusions based upon such a pyramiding of uncertainties, he must go further; he must also believe that the State of California by its reclamation patent demanded the reclamation of a river, navigable by law and in fact, to a point somewhere in the deepest part of its "main channel." A similar patent on the other shore followed by the required reclamation would have resulted in the damming of the river, or at least a 2-mile long sluiceway in which its waters would be narrowly confined.

But the most surprising feature of Robinson's testimony is that despite the great effort he put into the case to find and fix the "true boundaries" of S & O Survey #58, except for the riverward boundary, he did not change them at all. The northerly, easterly and southerly boundaries remained exactly where the county surveyor had placed them, firmly integrated with section lines and coterminous boundaries of other patents. He, as had Passarino, *changed* and *extended* the county surveyor's lines out into the river where they enveloped the 38 acres of tidelands. His "survey" was the same as Passarino's. And try as one will, no understandable or logical or credible reason can be found in his testimony *why* he concluded that the county surveyor intended, but failed, to place the survey's boundary

at the low tide mark. As said in *Herbert* v. *Lankershim, supra,* 9 Cal.2d 409, 471-473, it is not "mere swearing" but "swearing creditably" that is supportive of a trial court's findings and judgment.

The testimony of the witness Robinson also, does not rise to the level of substantial evidence.

Three additional facets of the evidence relied upon by plaintiffs should be discussed at this point.

### Boundaries of Nearby Patents

The trial court seemed to give some significance to the testimony of Passarino and Robinson concerning boundaries of nearby patents, particularly the adjoining Tide Land Corrected Survey No. 21 and Swamp and Overflowed Lands Survey No. 15. (See Figure Two, *supra.*) Passarino testified that the high tide line was not used as the boundary on any of the patents. Robinson agreed; he said he had examined "all of the other surveys in this general area" and that none of them purported "to follow the mean high tide line."

Tide Land Corrected Survey No. 21, with the exception of the "False Bay" area beyond the low tide mark (see Figure One, *supra*), covers tide-lands (salt marsh tidelands) in its entirety. This is undoubtedly why it is characterized as a "Tide Land" survey instead of "Swamp and Over-flow" as is S & O Survey #58. It is crystal clear to all that this survey, as the witnesses testified, does *not* follow the high tide line.

But for some reason, or perhaps no reason, the remaining contiguous survey and patent (Swamp and Overflowed Lands Survey No. 15, issued in 1883) were not offered in evidence at the trial. After affording each "party reasonable opportunity to meet such information" (see Evid. Code, § 459, subd. (d)), we have taken judicial notice of this patent, an act of the chief executive officer of the state, the Governor. (Evid. Code, § 452, subd. (c).) This patent (as does the survey on which it is based) defines its southwesterly boundary as *"thence . . . to Petaluma Creek; thence along the same in a southeasterly direction to a point"* where the boundary line again turns inland. Under established rules of our law, such a boundary is the *high tide line* of the river. (Civ. Code, § 830; *Martin* v. *Waddell, supra,* 41 U.S. (16 Pet.) 367; *United States* v. *Pacheco, supra,* 69 U.S. (2 Wall.) 587; *Shively* v. *Bowlby, supra,* 152 U.S. 1; *Wright* v. *Seymour, supra,* 69 Cal. 122; *Los Angeles* v. *San Pedro etc. R.R. Co., supra,* 182 Cal. 652; *Stillwell* v. *Jackson, supra,* 5 Cal.2d 165.)

The witnesses' testimony as to the other nearby patents was obviously based on the "intent" of the surveyors rather than on the lines as drawn, as

was their testimony concerning S & O Survey #58. Although these surveys were in evidence Passarino and Robinson made no attempt from them or otherwise to explain or verify their conclusion. And our examination of the documents reveals nothing to indicate a meander of the river's low tide line, any more than does S & O Survey #58.

The record suggests that the witnesses knew their testimony that none of the nearby patents used the high tide line as a boundary, at least as to Swamp and Overflowed Lands Survey No. 15, to be incorrect. The southernmost riverside course, "call 16," of Passarino's survey (concurred in by Robinson) was turned abruptly from the river's low tide line toward the high tide line of the land, where after joining an easterly "call 17" it intersects with the riverbank boundary of Swamp and Overflowed Lands Survey No. 15 above the high tide line. If the witnesses' survey had been consistent with their testimony the point of intersection would be at the low tide line of the river, at which level the neighboring patent's boundary would continue on downstream.

Little probative value attended the conclusions that none of the nearby patents' boundaries followed the ordinary high tide line.

*The Patent's Acreage*

As we have seen, Passarino's conclusion as to the county surveyor's intent was initially based on his (Passarino's) assumed need to bring the patent's designated acreage (934.65 acres) closer to that which was actually enclosed by its boundaries. He had explained that he had to "go out of the [patent's] boundary line" to bring the acreage "reasonably close to the area that was in the patent." He reasoned: "The only place that I know of that the area could be balanced, would have to lie in this area between the described patent line" and the "low water mark" of the river. That, he said, "is the only place where I know, in my opinion, that there is sufficient area to come anywhere close to the patent amount that was granted." He agreed with plaintiffs' counsel that the true line "just had to go out to the low water, otherwise, the acreage is short." Based on these and other considerations he concluded that the county surveyor in 1872 was really meandering the "channel and low water mark" although the courses and distances of his survey indicated otherwise.

Although the witness later changed this testimony, saying in response to a leading question that he "paid no attention to acreage," the trial court in its notice of intended decision stated that it was nevertheless an "aspect of the case to be considered."

■ Few principles of our law are as settled as the "invariable rule,

early adopted in this state, 'that when a piece of land is conveyed by metes and bounds, or any other certain description, all included within those bounds, or that description, will pass, whether it be more or less than the quantity stated in the deed. . . . The quantity being the least certain part of the description must yield to the boundaries or numbers, if they do not agree.' " (*Gragg* v. *Culp,* 198 Cal. 579, 585 [246 P. 43]; see also *Cecil* v. *Gray,* 170 Cal. 137, 140 [148 P. 935]; *Foss* v. *Johnstone,* 158 Cal. 119, 128-129 [110 P. 294]; *Tappendorff* v. *Downing,* 76 Cal. 169, 170 [18 P. 247]; *Stanley* v. *Green,* 12 Cal. 148, 164; *Verdi Dev. Co.* v. *Dono-Han Mining Co., supra,* 141 Cal.App.2d 149, 154; *Phelps* v. *Pacific Gas & Elec. Co., supra,* 84 Cal.App.2d 243, 248-249.)

The many authorities on the point are summarized in 8 Cal.Jur.2d, Rev., page 824, as follows: "In land measurement, quantity is the least reliable of all descriptions, and, in the absence of anything disclosing a different intention, a statement of the quantity of land conveyed by a deed does not prevail over a clear description of the boundaries of the tract. Even where the quantity of land to be granted is specifically stated, this amount cannot be made up by the grantee by running his boundary lines differently from lines clearly described and easily ascertained from the deed."

Even without consideration of this rule it is difficult to place any probative weight in the instant case on the recited acreage of 934.65. The figure was obviously an unsuccessful attempt of the county surveyor to compute the acreage *within* his 31 calls of courses and distances. It is inconceivable that he would attempt to determine area, to *hundredths of an acre,* in the unmeasured and unbounded spaces of the river between high and low tide lines, and beyond the survey lines he had established. It is worthy of note that, even in this age of calculating machines, none of the witnesses at the trial was able to definitely fix the acreage within the fixed boundaries of S & O Survey #58. Although it obviously can be reached with mathematical exactitude, they arrived at varying conclusions of "approximately 880," "between 880 and 883," "in round figures 888" and "850 more or less."

In any event plaintiffs now concede that the evidence of excess acreage has no probative value whatever. In their briefs they say: ". . . there is no question that a recital of excess or shortage in acreage is not grounds for altering the boundaries in a patent"; and that they have "never suggested before this court or the lower court that the fact that the perimeter description of the survey encompassed fewer acres than are recited in the patent should or could have any bearing upon the location of the southwest boundary of the survey."

*The County Surveyor's Plat*

Plaintiffs also rely on the county surveyor's perimeter plat (Figure Two, *supra*) adjacent to which is sketched the river. They contend that it *clearly shows* the boundary as running along the river's main channel at the low tide level. We do not think that such an interpretation is reasonably permissible.

The plat shows Petaluma River to closely follow the county surveyor's jagged calls along the irregular high tide line of the shore. Figure One, q.v., and other early days surveys in evidence, clearly establish the river's low tide line, at the side of its main channel, to be a sweeping gently curved line, wholly unlike the surveyor's serrated line at the water's edge.

Whatever probative value is to be found in the depicted relation of the plat of Figure Two to the adjacent river, it tends to support the State of California's case.

We have discussed all of the points of evidence which are contended by plaintiffs to be supportive of the trial court's findings and judgment. But in our overall determination of the nonexistence of substantial evidence, other considerations are of importance.

*Other Considerations*

1. By any reasonable standard S & O Survey #58 itself would seem to be the most persuasive evidence of what land the surveyor intended to cover.

2. As pointed out, the starting point of S & O Survey #58 and of one of its riverside calls was a stake set by the county surveyor "in a bed of broken glass" at the extreme westerly prominence of the survey. (See Figure Two, *supra.*) If plaintiffs' contention as to the low tide line *situs* of the surveyor's intended courses and distances be accepted, it would follow that he *intended* to and did place this land monument out in the stream bed where it would almost continuously be covered by the ocean's tidal waters. (See Figure One, *supra.*)

3. The clear purpose of the Act was to encourage the reclamation and use of certain of the state's "swamp and overflowed, salt marsh and tidelands." The evidence establishes that the immediate successors in interest to Reagan's rights, fulfilling their obligation to reclaim the patented land, did not reclaim the tidelands here at issue. Instead they constructed a levee near, but landward of, the river's high tide line, thus eliminating the tidelands from their reclamation plans. This strengthens the inference that the tidelands were neither included, nor intended nor believed to be

included, in the state's 1880 patent. It was not until many years later that plaintiffs' more immediate predecessors built another levee at the river's low tide line. ■■■ If a conveyance is open to construction as to the extent of the grant "the most reliable circumstance in aid of such construction is the practical construction given it by the acts of the parties" during the years immediately following its execution. (*Yocco* v. *Conroy*, 104 Cal. 468, 471 [38 P. 107]; see also *People* v. *Ocean Shore Railroad*, 32 Cal.2d 406, 414 [196 P.2d 570, 6 A.L.R.2d 1179]; *Gramer* v. *City of Sacramento*, 2 Cal.2d 432, 440 [41 P.2d 543].)

4. The evidence shows that the several successive grants of S & O Survey #58 land following the 1880 patent (apparently 10 in all, including the grant to plaintiffs) describe the riverward boundary as the *"bank"* of Petaluma Creek. None recites the county surveyor's meandering courses and distances on the river's edge, and none refers to a boundary at low tide line. The *bank* of a river is that which " 'contains the river in its natural channel when there is the greatest flow of water.' . . ." (*Ventura Land etc. Co.* v. *Meiners,* 136 Cal. 284, 290 [68 P. 818].) ■■■ An inference may reasonably be drawn that plaintiffs' predecessors, and even plaintiffs when they took title, believed the land to be bounded by the river's high tide line.

5. As we have indicated the only *upland* patent adjoining S & O Survey #58 was that of Swamp and Overflowed Lands Survey No. 15, to the east and south. The latter patent was issued by the state in 1883. This patent expressly ran "along Petaluma Creek" which, since tidal waters are involved, as a matter of law was the river's high tide line. "When tide water is the boundary, the rights of the grantor to ordinary high-water mark are included in the conveyance." (Code Civ. Proc., § 2077, subd. 5; see also Civ. Code, § 830; *Bouchard* v. *Abrahamsen, supra,* 160 Cal. 792, 799; *Long Beach Land & Water Co.* v. *Richardson, supra,* 70 Cal. 206; *More* v. *Massini,* 37 Cal. 432, 435-436; *Carlson* v. *Richardson,* 267 Cal.App.2d 204, 207 [72 Cal.Rptr. 769]; *Eichelberger* v. *Mills Land etc. Co.,* 9 Cal.App. 628, 639-640 [100 P. 117].) It seems unlikely that either the State of California or the county surveyor intended the patent of Swamp and Overflowed Lands Survey No. 15 to run to the river's *high tide line* while its immediately adjacent patent to the north was intended to run to the *low tide line;* any inference that such was the case seems most implausible.

6. Civil Code section 1069 provides: "A grant is to be interpreted in favor of the grantee, except that a reservation in any grant, and *every grant by a public officer or body, as such, to a private party, is to be interpreted in favor of the grantor.*" (Italics added.) While in the case at bench the

patent grant is admittedly unambiguous, the obvious public policy behind section 1069 would seem to call for application of its rule to the dispute here over the "location" of one of the grant's boundaries.

7. And, of course, upon the plaintiffs rested the burden of proving title to the subject tidelands. (*Ernie* v. *Trinity Lutheran Church*, 51 Cal.2d 702, 706 [336 P.2d 525].)

It becomes unnecessary to our disposition of this appeal to consider the State of California's conditional contention that in any event the state, in granting the patent based on S & O Survey #58, retained an easement in Petaluma River's tidelands for the purpose of commerce, navigation, and fisheries.

The judgment is reversed; the superior court will enter judgment quieting title to the disputed tidelands in the State of California.

Molinari, P. J., and Sims, J., concurred.