[No. A043385. First Dist., Div. Three. July 23, 1990.]

In re RODNEY ALCALA on Habeas Corpus.

John K. Van de Kamp, Attorney General, Morris Lenk and John G. Donhoff, Jr., Deputy Attorneys General, for Appellant.

Donald Specter, under appointment by the Court of Appeal, for Respondent.

OPINION

**BARRY-DEAL, J.**\*—Daniel Vasquez, the Warden of San Quentin Prison, appeals from an order enjoining enforcement of restrictions on the right of prisoners to possess and wear certain items of civilian clothing. We hold that the right to wear clothing of one's choice is a protected liberty interest under the substantive due process guaranties of the Fourteenth Amendment. We conclude, however, that the restrictions are not an unconstitutional infringement on the right of prisoners to self-expression through clothing choice, nor do they violate the prisoners' statutory rights under Penal Code sections 2600 and 2601.[1] Accordingly, we vacate the order.

## I. *Background*

A. *Statutory and Administrative.* The Director of the Department of Corrections is vested with the supervision, management, and control of the state prisons (§ 5054) and is authorized to prescribe and amend rules and regulations for the administration of those institutions (§ 5058). Such rules and regulations must be promulgated according to the Administrative Procedure Act (Gov. Code, § 11340 et seq.; *Faunce* v. *Denton* (1985) 167 Cal.App.3d 191, 196 [213 Cal.Rptr. 122]) and are set out in division 3 of title 15 of the California Code of Regulations.[2]

---

\*Retired Associate Justice of the Court of Appeal sitting under assignment by the Acting Chairperson of the Judicial Council.

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] This publication was known before January 1, 1988, as the California Administrative Code, and is the official compilation of the adoption, amendment, or repeal of state agency regulations. (Gov. Code, §§ 11344, 11340 et seq.) Courts are required to take judicial notice

Subject to the orders and policies established by the department, each warden has the duty to supervise the government, discipline, and policy of the prison, and to enforce all orders and regulations. (§ 2079.) The procedural detail necessary to implement the rules and regulations of the director is not always included in each regulation but is found in the appropriate departmental procedural manuals and in the operational plans and procedures of the respective institutions. (Cal. Code Regs., tit. 15, div. 3, ch. 1, preface.)

Under the general policy of the Department of Corrections, the warden is directed to establish a list of personal property items and the maximum amount of such items an inmate may have in his or her possession in the institution. (Cal. Code Regs., tit. 15, § 3190, subd. (a).) In addition to state-issued items, an inmate may have personal property items that present no threat to institution security or the safety of persons and that do not exceed a certain cubic space. (Cal. Code Regs., tit. 15, § 3190, subds. (a), (b).) On clothing, the regulations provide that "(a) Inmates may possess only those items of state clothing that have been issued to them or specifically authorized for their possession. [¶] (b) Inmates may possess only those items of personal clothing authorized by the warden or superintendent and as property acquired in accordance with institution procedures." (Cal. Code Regs., tit. 15, § 3032.)

Thus, under the regulations Warden Vasquez was authorized to promulgate rules relating to the items of personal clothing each inmate was allowed to possess and wear unless those rules exceeded his statutory authority or infringed upon a constitutional right of the inmates. (See *Ford Dealers Assn.* v. *Department of Motor Vehicles* (1982) 32 Cal.3d 347, 356 [185 Cal.Rptr. 453, 650 P.2d 328]; *Stoneham* v. *Rushen* (1984) 156 Cal.App.3d 302, 308 [203 Cal.Rptr. 20].)

B. *Procedural History of This Case.* The Prison Law Office representing the prisoners has been engaged for some time in litigation and settlement negotiations with the warden over the rules relating to the inmates' possession and storage of personal property in prison. An agreement on the permissible property was reached, and a hearing on the reasonableness of the settlement and on the allowable storage space was scheduled for September 10, 1986.[3] In the interim, a new conflict developed when the prison

---

of the "contents of each regulation which is printed or which is incorporated by appropriate reference into the California Code of Regulations . . . ." (Gov. Code, § 11344.6.)

[3] A significant portion of the reporter's transcript in this appeal relates to the size of storage cubicles each inmate is allowed to have in his cell, one of the matters covered in title 15, California Code of Regulations, section 3190. This issue was apparently resolved and is not raised on appeal.

authorities, without notice or an opportunity for comment, issued a memorandum on July 30, 1986 (hereafter the July 30 memorandum), restricting the items of civilian clothing that the prisoners in the main institution were entitled to possess and wear.

Before these deletions from the approved list of clothing were issued, the inmates had for a number of years been allowed to wear some civilian clothing in restricted areas. All prisoners, however, were required to wear blue jeans, and no one else within the institution was permitted to wear them.

The July 30 memorandum recited that recently civilian clothing was used to perpetrate or facilitate a number of escapes and escape attempts. It further recited that to insure compliance with the Department of Corrections mandate that security remain the foremost consideration, institution procedure No. 215 had been reviewed and revised regarding personal civilian clothing for inmates in the main institution. The July 30 memorandum then stated that for security reasons the following seven items of personal clothing were being deleted from the approved list: shirts, sweat shirts, sweat pants, baseball caps, colored T-shirts, windbreakers, and sweaters. Inmates were given the month of August to dispose of these items; items not disposed of by inmates would be confiscated in the month of September.

On August 14, 1986, in response to the July 30 memorandum, Rodney Alcala (petitioner), represented by the Prison Law Office, filed an application on behalf of himself and all others similarly situated for further preliminary relief (petition for writ of habeas corpus) seeking judicial invalidation of the warden's deletions from the approved list of clothing on the ground that they violated the prisoners' constitutional and statutory rights to personal expression through clothing choice.[4] He did not challenge the long-standing rule that all San Quentin inmates must wear blue jeans. The same day, petitioner obtained an ex parte temporary restraining order enjoining enforcement of the restrictions pending a hearing on whether they violated the prisoners' rights.

The warden filed opposition (return to the order to show cause), and petitioner filed a declaration and memorandum in reply (traverse) to that

---

[4] A petition for writ of habeas corpus is an appropriate vehicle for persons lawfully in custody who seek to vindicate rights to which they are entitled while in confinement. (*In re Head* (1986) 42 Cal.3d. 223, 228 [228 Cal.Rptr. 184, 721 P.2d 65]; see generally, 6 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) Extraordinary Writs, §§ 3332, 3355, pp. 4126, 4163-4164.) Although the parties here did not use traditional names for their pleadings, they fall into the pattern of petition-return-traverse. At oral argument counsel for petitioner stated that his pleading was intended as a petition for writ of habeas corpus.

pleading. After a three-day hearing in September 1986, the court issued a tentative decision on January 20, 1987, finding that the warden, in his efforts to manage the threat to security, failed to show that he had explored less intrusive alternatives and found them ineffective. It directed petitioner to prepare a proposed statement of decision. More than a year later, on June 17, 1988, the court adopted the statement of decision submitted by petitioner and issued its order enjoining enforcement of the July 30 memorandum. This timely appeal by the warden followed. (See § 1506.)

## II. *The Hearing*

At the three-day hearing in September 1986, the court heard, in addition to the warden's evidence, the testimony of Joseph Cannon, a correctional expert called by petitioner, and that of two experts and several correctional officers called by the warden.

The warden's testimony, amplified by his declaration under penalty of perjury executed in August 1986, showed the following facts. At the time of the declaration, San Quentin was a maximum security facility housing approximately 2,500 level IV inmates.[5] The general population consisted of about 800 inmates, about 50 percent of whom were serving life sentences. The rest of the population, about 1,750 inmates, was housed in maximum security lockup facilities. Warden Vasquez believed this was the largest lockup facility in the country.[6]

Warden Vasquez stated that between January 1985 and August 1986 there had been 10 incidents of escape or serious threat of escape. Eight of the prisoners involved were imprisoned for first degree murder, and two for sexual offenses against women or children. Nine of the ten prisoners involved in these incidents were serving life sentences; the other was serving a sentence of fifty-two years. The warden stated, "In nine of the ten incidents it appears that civilian clothing was used to facilitate the escape or attempted escape."

The warden attached to his declaration certified copies of reports on the escapes and attempted escapes. The reports showed the following. On July

---

[5] Inmates in state prison are classified as level I, II, III, or IV, based on a point system which takes into account a number of factors, including the background and behavior of each inmate. Level I is minimum security, and level IV represents maximum security. (See Cal. Code Regs., tit. 15, § 3375.)

[6] Petitioner asks that we take into account changes in the San Quentin population by taking judicial notice of a few lines of reporter's transcript taken from testimony by Warden Vasquez in a May 1989 proceeding. We agree with the People that we should decide this appeal based on the facts adduced at trial. The effect, if any, of changes in the inmate population on the validity of our decision must be determined in an appropriate forum at an appropriate time. (See generally, 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 252, pp. 258-259.)

25, 1986, inmates Alve, Chavez, and Rodriguez were caught while attempting to climb the wall surrounding the industries area of San Quentin. Each was dressed in civilian clothing.

On June 10, 1986, inmate Adams escaped. He had worked earlier that day in the education department offices. Approximately 30 pieces of civilian clothing were found during the subsequent search of the Education Building. Also found were a wig, women's trousers, and cosmetics. It was suspected that clothing from this area was used to facilitate Adams's escape.

On December 10, 1985, inmate Price apparently attempted to escape by hiding in the electrical shop. There is no indication that he was wearing civilian clothes.

On October 31, 1985, inmates Thomas and Reach were caught while hiding in a pile of laundry in the laundry area. They had with them a bag containing a large number of items of civilian clothing.

On May 17, 1985, inmate Sanchez escaped. He had been seen shortly after noon dressed in civilian clothing, which was unusual for him. An investigation led to the conclusion that he had left San Quentin "through the Front Count Gate, dressed in a rust colored long sleeve velour shirt and light blue denim pants." He had attempted a similar escape 11 months earlier from Vacaville.

On January 17, 1985, a search of an air vent on the roof of a cell block revealed articles of civilian clothing to which rubber silicone had been applied, apparently to waterproof them. Investigation revealed fingerprints and other evidence connecting inmates Dow and Garcia to the clothing and to a conspiracy to escape.

Warden Vasquez stated in his declaration that in July 1986, "in an attempt to curtail the number of escapes and attempted escapes, I decided to prohibit the inmates at San Quentin from possessing civilian clothing." The July 30 memorandum restricting the allowable items of personal clothing was issued pursuant to this decision. Among the many factors which the warden considered in making this decision were the number of recent escapes and attempted escapes in which civilian clothing was used, the composition of the inmate population at San Quentin, crimes committed by those who had escaped or attempted to escape, the necessity for instant recognition of inmates within the prison in emergency situations, the need easily to recognize and distinguish those inmates who might successfully escape from the institution, the danger posed to other inmates and prison

personnel by inmates attempting to escape, and the danger posed to the public by escapees.

Warden Vasquez's declaration concluded, "For these reasons, and based on my experience of more than 20 years in the corrections field [his declaration began with a resume], I believe that the restrictions contained in the July 30, 1986, Memorandum are necessary to insure institutional security and for the reasonable protection of the public." Because of the "severity of the decision," Warden Vasquez ordered that there be a 30-day grace period.

Warden Vasquez testified that in the wake of the May 1985 Sanchez escape, before the July 30 memorandum became effective, the wearing of civilian clothing by prisoners already had been restricted to housing units, family visits, and sweatshirts for exercise. The July 30 memorandum was implemented because of the recent escapes and escape attempts. The decision to restrict civilian clothing was also based on the recommendation of the security assessment committee. When asked how an inmate such as Sanchez, who was wearing a personal shirt in violation of this rule, could have been allowed to escape, the warden explained that if a guard is busy searching 50 or 100 inmates for weapons or other articles of contraband, he or she might not be cognizant of what each inmate is wearing.

Joseph Cannon, an expert on prisons, received his master of social work degree in 1956, was warden of the Illinois State Penitentiary from 1973 to 1974, and currently is a professor at the University of Missouri in the Administration of Justice Department of the College of Arts and Sciences. He spent about two hours touring San Quentin and studied its security procedures. He stated that he was "very impressed with the security at San Quentin." After reviewing reports about the escapes and the declarations attached to the pleadings, Professor Cannon testified that in his opinion "the only way a person escapes from an institution is when there's a breakdown in the perimeter control of the institution on the part of the security staff." He did not believe that clothing had any impact on the escapes.

When asked to explain this opinion in light of the fact that inmate Sanchez had apparently escaped through a front gate wearing civilian clothing, Professor Cannon stated that when he himself had left San Quentin the guards had compared his face with the picture on his driver's license twice and had ascertained that he was the person who had signed in a few hours earlier. The procedure, he said, is a good one; escapes occur because of a breakdown in procedure, because of human error, not because of what a person is wearing.

Based upon Professor Cannon's testimony, the trial court found, "The clothing worn by inmates generally does not have any impact on their ability to escape."

On the other hand, Amos Reed, the warden's expert, was not so single-minded. Mr. Reed, former secretary of the Washington State Department of Corrections and past president of the American Correctional Association, the National Association for State Correctional Administrators, and the National Association of Training Schools and Juvenile Agencies, received his master's degree in Education-Social Science and has received numerous awards and honors, including the Distinguished Service Award, National Institute of Corrections. Reed testified that under the present standards of the American Corrections Association, prisons should issue clothing to inmates and " '[c]ivilian attire should be available in limited quantities for leisure visiting, work release and furloughs.' " Based on his knowledge of San Quentin and on having read the relevant escape reports, his personal and professional opinion was that the July 30 memorandum was neither arbitrary nor capricious. It was Mr. Reed's experience that "[p]risoners do use civilian clothing in their escapes and their escape attempts." It was also his experience that civilian clothing can be of substantial assistance to prisoners waiting for an opportunity to escape. He believed that Warden Vasquez had to take steps to prevent the use of civilian clothing by inmates attempting to escape.

On cross-examination Mr. Reed stated that he understood that San Quentin was undergoing conversion to a lesser secured institution and that this should mean more civilian attire for the lower security levels. He testified that the clothing restriction alone would not take care of the problem, and that other factors to be considered would be quantity and quality and ongoing training of staff; manner, quality, and quantity of checks; attention to entry points; and generally "plugging all the loopholes." In particular, Mr. Reed stated that he would "tighten . . . up" the checkpoints to prevent prisoners' walking out. He also pointed out a particular "blind spot" where a prisoner had been killed.

Regarding the Alve-Chavez-Rodriguez attempted escape, Mr. Reed opined that the existence of two unstaffed wall posts was "not approvable in the daytime," although it was permissible during a lockdown at night.

Petitioner's attorney asked Mr. Reed whether there was "any evidence in [Warden Vasquez's declaration] that you are basing your opinion on that these prisoners would not have tried or escaped but for the personal clothing?" He answered, "I can't say that." Based upon this answer and another discussed below, the trial court found that "There is no evidence that

inmates would not have escaped or attempted to escape absent personal clothing."

Jiro Jerry Enomoto, Director of the California Department of Corrections from 1975 to 1980, also testified for the warden as an expert. Mr. Enomoto received his master of social work degree at the University of California, Berkeley, and served in a variety of assignments in the California Department of Corrections from 1952 to 1975; he had been a consultant since 1980 on criminal justice. He stated that the warden's decision was reasonable, and that if the warden had not taken some action of this kind, he would not have been acting responsibly. Mr. Enomoto testified that a primary concern of prison officials is to prevent escape, and that if it appears property has been used to facilitate escape, this would have to be considered. After reviewing the pertinent reports, he concluded that "the personal clothing played some part in the inmates' escape or attempt to escape . . ." and that the action taken by the warden was an effective means of keeping the property from being used in escape attempts. Based on his experience, he could not think of a more effective way of accomplishing the intended result. In particular, Mr. Enomoto did not believe that strict enforcement of previous limits on clothing would be as effective as a complete ban, because numerous checkpoints would have to be established to be sure inmates were not wearing personal clothing under their prison clothing. This would not be "reasonably practical," due to the number of inmates and the limited number of staff.

Mr. Enomoto stated that even if perimeter security were improved, inmates would still be using personal clothing to attempt to escape if they were permitted to possess such clothing. He agreed with Mr. Reed that the weakest link in prison security is human error, and he stated that when a major incident occurs, it is because staff did not follow a procedure or became careless in some way.

Mr. Enomoto testified that based on his experience, he believed that personal clothing is of substantial assistance to inmates who attempt to escape, and that removal of such clothing from the institution is a method without equal in dealing with this problem.

On cross-examination Mr. Enomoto explained his view of the role clothing played in the escapes under consideration. He said that "a number of those escapes, two successful ones and attempted escapes[,] seem to be evidence that the possession of clothing or the wearing of clothing by these inmates in some manner, I believe, facilitated those attempts or was intended to facilitate later behavior if they succeeded in going into the institution's security department." He agreed that because inmates are required to wear

blue jeans, guards ought to be able to distinguish between inmates and others. But he again stressed the importance of human error in these situations.

Mr. Enomoto opined that if the warden were barred from enforcing the July 30 memorandum, he would need to take other measures such as hiring additional staff, creating more checkpoints, initiating more patdown searches, and perhaps modifying the physical plant of San Quentin. He repeated that taking away the personal clothing was the "most effective" way to prevent it from being used in escapes, but he agreed that there were other methods of improving security to prevent escape. These included helping staff to increase the power of observation or their ability to carry out security responsibilities.

Petitioner's attorney asked this witness, as he did Mr. Reed, "What facts are there in these documents about the escapes which suggest to you that but for the prisoners having personal clothes or personal shirts, they would have not either escaped or attempted to escape?" Mr. Enomoto answered, "There are no facts in the information I looked at that specifically indicated that. . . . And I don't believe that I ever indicated . . . that that was my belief." This was the second bit of testimony cited by the trial court to support its finding that "[t]here is no evidence that inmates would not have escaped or attempted to escape absent personal clothing."

Based on this evidence the court determined that civilian clothing was not the proximate cause of the escapes, that there was no evidence that a prisoner, after safely blending in with free persons, had jeopardized the safety of the public, and that escapes from prison are usually caused by a breakdown in the perimeter control procedures. The court found that the warden did not consider the alternative of tightening security measures, thereby retaining the prisoners' rights to personal clothing and thus preserving the human dignity of each prisoner. The trial court then held that the revised rules were invalid under sections 2600 and 2601 because they were an impermissible infringement on the prisoners' constitutional right to personal expression.

### III. *Prisoners' Rights Under Federal and State Law*

To focus more clearly on the issue before us, we briefly review the federal and state approaches to the constitutional and statutory rights of prisoners.

Before 1975 when the current sections 2600 and 2601 were enacted, California statutory law provided for the "civil death" of persons committed to prison. (See generally, *De Lancie v. Superior Court* (1982) 31 Cal.3d

865, 870-871 [183 Cal.Rptr. 866, 647 P.2d 142]; 3 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) Punishment for Crime, § 1279, p. 1481.) By 1968, the severity of the original statute had been tempered, and the amended section 2600 authorized the Adult Authority or the trial court to restore certain civil rights where appropriate. It also exempted from the operation of the statute specific rights (to inherit property, to correspond with counsel, and to purchase, receive, and read books and periodicals). (Stats. 1968, ch. 1402, § 1, pp. 2763-2764; *De Lancie, supra,* at pp. 870-871.)

California decisions from 1850 to 1975 generally reflected both the legislative restrictions on prisoners' rights and a judicial deference to prison administrators. (See, e.g., *In re Riddle* (1962) 57 Cal.2d 848, 852 [22 Cal.Rptr. 472, 372 P.2d 304]; *In re Ferguson* (1961) 55 Cal.2d 663, 671 [12 Cal.Rptr. 753, 361 P.2d 417]; *Yarish* v. *Nelson* (1972) 27 Cal.App.3d 893, 898 [104 Cal.Rptr. 205].)

A similarly restrictive approach to prisoners' rights and to courts' limited role in the running of prisons is still followed in the federal jurisdiction. The Supreme Court summarized the standards in *O'Lone* v. *Estate of Shabazz* (1987) 482 U.S. 342, 348-350 [96 L.Ed.2d 282, 289-290, 107 S.Ct. 2400]:

"Several general principles guide our consideration of the issues presented here. First, 'convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison.' [Citations.] Inmates clearly retain protections afforded by the First Amendment [citation] including its directive that no law shall prohibit the free exercise of religion. [Citation.] Second, '[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.' [Citation.] The limitations on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives—including deterrence of crime, rehabilitation of prisoners, and institutional security. [Citations.]

"In considering the appropriate balance of these factors, we have often said that evaluation of penological objectives is committed to the considered judgment of prison administrators, 'who are actually charged with and trained in the running of the particular institution under examination.' [Citations.] To ensure that courts afford appropriate deference to prison officials, we have determined that prison regulations alleged to infringe constitutional rights are judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights. [Citation.] We recently restated the proper standard: '[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.' [Citation.] This approach ensures the ability of corrections officials 'to

anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration,' [citation] and avoids unnecessary intrusion of the judiciary into problems particularly ill-suited to 'resolution by decree.' [Citations.]" (Fn. omitted.)

This reasonable relationship test applies in federal cases even where the constitutional right claimed to have been infringed is fundamental, so that the state under other circumstances would have been required to satisfy a more rigorous standard of review. (*Washington* v. *Harper* (1990) 494 U.S. 210, __ [108 L.Ed.2d 178, 200, 110 S.Ct. 1028, 1037], citing *Turner* v. *Safley* (1987) 482 U.S. 78, 89 [96 L.Ed.2d 64, 78-79, 107 S.Ct. 2254].)

Until 1975, the California and federal approaches remained similar. However, in that year the California Legislature "discarded the punitive version of section 2600 entirely and replaced it with the current version, designed to *protect* rather than eviscerate the rights of state prisoners." (*De Lancie* v. *Superior Court, supra*, 31 Cal.3d at p. 871, original italics.) Where the previous statute had denied all rights with a few specified exceptions, in 1975 the Legislature inverted the statutory provision by enacting a new section 2600 providing that: "A person sentenced to imprisonment in a state prison may, during any such period of confinement, be deprived of such rights, and only such rights, as is necessary in order to provide for the reasonable security of the institution in which he [or she] is confined and for the reasonable protection of the public." (Stats. 1975, ch. 1175, § 3, p. 2897.)

At the same time, the Legislature enacted section 2601, which lists a number of rights retained by imprisoned persons notwithstanding any other provision of law. These included the right to inherit, own, sell, or convey real or personal property; the right to correspond confidentially with an attorney or public official; the right to purchase, receive, and read periodicals and books; the right to have personal visits; and the right to marry. (Stats. 1975, ch. 1175, § 3, pp. 2897-2898.) (The Legislature declined, however, to restore the franchise to imprisoned or paroled felons. (*Flood* v. *Riggs* (1978) 80 Cal.App.3d 138, 155 [145 Cal.Rptr. 573].))

Since the reenactment of sections 2600 and 2601, California courts have been redefining the state law applicable to claimed violations of prisoners' rights. Our Supreme Court expressed the view that "[t]he Legislature, in enacting these sections [2600 and 2601], evidently intended to place the rights of inmates *as nearly as possible* on the same footing as noninmates, subject to the needs of institutional security or protection of the public." (*De Lancie* v. *Superior Court, supra*, 31 Cal.3d at pp. 875-876, italics added.) The court declared in *In re Arias* (1986) 42 Cal.3d 667 [230 Cal.Rptr. 505,

725 P.2d 664] that "while federal cases may be illustrative of the problems inherent in balancing the state's security interests against the rights of detainees [citation], they do not define the scope of rights guaranteed by section 2600." (*Id.*, at p. 691.)

■ Guidelines for analyzing claims that prison authorities have violated a right protected under the revised statute were set out in *In re Arias, supra,* 42 Cal.3d at pages 689-690: "Reviewing a claim under section 2600 requires a three-step inquiry: (1) Are any 'rights' implicated? (2) If they are, does a 'reasonable security' problem exist which might permit a deprivation of rights under the statute? (3) If so, to what extent are deprivations of those rights 'necessary' to satisfy reasonable security interests." (Fn. omitted.) And the first step in the balancing analysis under section 2600 must begin with a discussion of the rights of nonconfined citizens. (*Id.*, at p. 691.)

With this background in mind, we turn to the case before us. We first consider whether any rights are implicated.

## IV. *The Constitutional Right to Clothing Choice*

The trial court, following the first step in the *Arias* guidelines, held that the rights at issue were those of free citizens and began with the proposition that "[t]he right to wear the clothes of one's choice is self-evident." As authority for this statement, the court found that choice of clothing is a means of personal expression which implicates (1) freedoms guaranteed by the First Amendment to the United States Constitution and (2) the right of privacy guaranteed by article I, section 1 of the California Constitution. (On appeal, petitioner continues to rely on the California right of privacy, but seemingly has abandoned the First Amendment in favor of the Fourteenth Amendment of the United States Constitution as the source of his constitutional right to personal expression through clothing choice.)

A. *No Specific Constitutional Guaranties.* The right to wear clothing of one's choice is not explicitly granted by either the United States Constitution or the California Constitution, and we have found no case in our highest courts directly ruling on this issue *in a noninstitutional setting.* A few cases have indirectly referred to some presumed right to such a choice, but without any clear holding.

For example, in *Kent v. Dulles* (1958) 357 U.S. 116 [2 L.Ed.2d 1204, 78 S.Ct. 1113], the court stated that "[travel] may be as close to the heart of the individual as the choice of what he [or she] eats, or *wears*, or reads. Freedom of movement is basic in our scheme of values. [Citations.]" (*Id.*, at

p. 126 [2 L.Ed.2d at pp. 1210-1211], italics added.)[7] The court declined, however, to decide the constitutional issue of the right to travel and held that the Secretary of State was not authorized under the regulations at issue to withhold a passport for international travel. (*Id.*, at p. 129 [2 L.Ed.2d at p. 1212].) In the only United States Supreme Court case we have found addressing the issue of personal appearance, *Kelley* v. *Johnson* (1976) 425 U.S. 238 [47 L.Ed.2d 708, 96 S.Ct. 1440] (upholding hairstyle regulations for members of the police force), the court recognized that its cases offered little guidance on "whether the citizenry at large has some sort of 'liberty' interest within the Fourteenth Amendment in matters of personal appearance . . . ." (*Id.*, at p. 244 [47 L.Ed.2d at p.] 714.)[8]

B. *Clothing as Symbolic Speech.* ■ Although no authority supports a general right of freedom of choice in clothing, clothing choices which are in effect political speech are protected by the First Amendment. Symbolic speech, i.e., a message implied by conduct, is protected by the First Amendment if the speaker intends "to convey a particularized message" through his or her conduct and if "the likelihood [is] great that the message would be understood by those who viewed it." (*Spence* v. *Washington* (1974) 418 U.S. 405, 410-411 [41 L.Ed.2d 842, 847, 94 S.Ct. 2727]; cf. *Powers* v. *Floersheim* (1967) 256 Cal.App.2d 223, 233 [63 Cal.Rptr. 913].)

In *Tinker* v. *Des Moines School Dist.* (1969) 393 U.S. 503 [21 L.Ed.2d 731, 89 S.Ct. 733], the United States Supreme Court recognized the wearing of black armbands by high school students in protest against the Vietnam war to be "closely akin to 'pure speech' which . . . is entitled to comprehensive protection under the First Amendment. [Citations.]"[9] (393 U.S. at

---

[7] The court commented that the right to travel was emerging at least as early as the Magna Carta and quoted article 42 of that document which excepts prisoners from those entitled to the right. (*Kent* v. *Dulles, supra,* 357 U.S. at pp. 125-126, fn. 12 [2 L.Ed.2d at p. 1210].) According to the court, the source of the right to travel was found in the Fifth Amendment to the United States Constitution prohibiting the federal government from depriving any person of life, liberty, or property without due process of law. (*Id.*, at p. 125 [2 L.Ed.2d at p. 1210].)

[8] Before *Kelley* v. *Johnson,* a number of cases involving hairstyle and facial hair growth had been decided in the lower federal courts, but the court had regularly denied certiorari. In *Olff* v. *East Side Union High School District* (1972) 404 U.S. 1042 [30 L.Ed.2d 736, 92 S.Ct. 703], Justice Douglas wrote an impassioned dissent to the denial of certiorari of a Ninth Circuit decision (*King* v. *Saddleback Junior College District* (9th Cir. 1971) 445 F.2d 932), urging the court to decide the issue of the right to choose hairstyle because over 50 reported cases had raised the issue and had been about evenly split over the constitutional validity of hair regulation in schools and other institutions. (*Olff, supra,* 404 U.S. at pp. 1045-1046, fn. 5 [30 L.Ed.2d at p. 738] (dis. opn. of Douglas, J.); see also Comment, *Constitutional Validity of Employer Dress and Grooming Codes* (1975) 9 U.S.F. L.Rev. 515, citing cases.)

[9] Similarly, relying on *Tinker,* our California Supreme Court in *In re Reynolds* (1979) 25 Cal.3d 131 [157 Cal.Rptr. 892, 599 P.2d 86] found that the prohibition against wearing of Prisoners Union lapel buttons unlawfully restricted prisoners' liberty of speech in violation of

pp. 505-506 [21 L.Ed.2d at p. 737].) ■ Although the right to political expression by symbolic speech is thus well established, the trial court's reliance on *Tinker* is misplaced. In *Tinker* the court distinguished symbolic speech from problems relating to "regulation of the length of skirts or the type of clothing, to hair style, or deportment. [Citations.]" (*Id.*, at pp. 507-508 [21 L.Ed.2d at p. 738], citing *Ferrell* v. *Dallas Independent School District* (5th Cir. 1968) 392 F.2d 697 and *Pugsley* v. *Sellmeyer* (1923) 158 Ark. 247 [250 S.W. 538, 30 A.L.R. 1212]; see 7 Witkin, Summary of Cal. Law (9th ed. 1988) Constitutional Law, § 237, pp. 326-328.)

Here, however, there is no suggestion in the record that the prisoners are attempting symbolic speech, no indication of what message they seek to convey, and no evidence that identifies the audience which they may be trying to reach. Thus, to the extent that the decision of the trial court is based on First Amendment grounds, it is not supported by the record. (*Montalvo* v. *Madera Unified Sch. Dist. Bd. of Education* (1971) 21 Cal.App.3d 323, 334 [98 Cal.Rptr. 593]; *East Hartford Ed. Ass'n* v. *Bd. of Ed. etc.* (2d Cir. 1977) 562 F.2d 838, 858-860.)[10] We conclude that petitioner's vague, unfocused message of personal expression does not merit the protection of the First Amendment.[11] Nevertheless, petitioner's right to

---

section 2600. In *Reynolds* the petitioner inmate argued "that wearing the button would indeed express an idea because of the Union's history, goals, and reputation in prisons. It is 'an economical means of expressing an attitude of pride, an analysis of what is both important and possible to change about life in prison, and a set of values about how to proceed.' " (*Id.*, at p. 134.) The court, in prohibiting enforcement of the ban, stressed that the Director of Corrections had made no showing that wearing the buttons had caused past disruption, nor had the director cited any reasons for predicting future disruptions. Therefore, the ban did not meet the test of section 2600, which permits restrictions on rights only as necessary to provide for the reasonable security of the prison and for the reasonable protection of the public. (*Reynolds, supra,* at pp. 134-135.)

*Reynolds* is distinguishable from the case before us because there (1) the inmates advanced a specific message they wished to convey, and (2) the director failed to offer any reasons for the necessity for the proposed ban.

[10] Furthermore, the United States Supreme Court has rejected the "view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." (*United States* v. *O'Brien* (1968) 391 U.S. 367, 376 [20 L.Ed.2d 672, 679, 88 S.Ct. 1673]; *Cox* v. *Louisiana* (1965) 379 U.S. 536, 555 [13 L.Ed.2d 471, 484-485, 85 S.Ct. 453]; cf. *Clark* v. *Community for Creative Non-Violence* (1984) 468 U.S. 288, 298 [82 L.Ed.2d 221, 230, 104 S.Ct. 3065]; see also *Connick* v. *Myers* (1983) 461 U.S. 138, 147 [75 L.Ed.2d 708, 720, 103 S.Ct. 1684].)

[11] In section 5009 the Legislature provided that "all prisoners shall be afforded reasonable opportunities to exercise religious freedom." Here there is no claim that the clothing choice had a religious connotation, unlike that of the prisoner in *Gallahan* v. *Hollyfield* (4th Cir. 1982) 670 F.2d 1345, 1346-1347 [prison regulations requiring half-blooded Cherokee Indian to cut hair in violation of his religious tenets was not justified because less restrictive alternatives were available and therefore regulations unconstitutionally restricted prisoner's right to free exercise of religion]. Where no religious claims were made, hair length policy was held reasonable and within prison official's discretion in *Wilson* v. *State* (1987) 113 Idaho 563 [746 P.2d 1022, 1024].

personal expression through choice of appearance has at least limited protection under the Fourteenth Amendment and is thus entitled to judicial review.

C. *Clothing Choice as a Protected Liberty Interest.* Section 1 of the Fourteenth Amendment of the United States Constitution provides in relevant part: " . . . No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." (The Fifth Amendment contains a similar restriction on the federal government, and article I, sections 7 and 15 of the California Constitution also contain due process guaranties.) ■ The Fourteenth Amendment "affords not only a procedural guarantee against the deprivation of 'liberty,' but likewise protects substantive aspects of liberty against unconstitutional restrictions by the State. [Citations.]" (*Kelley* v. *Johnson, supra,* 425 U.S. at p. 244 [47 L.Ed.2d at p. 713].) Implicit in the concept of liberty is the guaranty of personal privacy. (*Roe* v. *Wade* (1973) 410 U.S. 113, 152 [35 L.Ed.2d 147, 176-177, 93 S.Ct. 705].) This right of privacy, however, is subject to reasonable limitation. (*Id.,* at pp. 152-153 [35 L.Ed.2d at pp. 176-177].)

Although the rights of liberty and privacy are evolving constitutional doctrines, the Supreme Court has thus far extended their protection only to the basic personal decisions relating to marriage, procreation, contraception, family relationships, and child rearing and education. (*Carey* v. *Population Services International* (1977) 431 U.S. 678, 685 [52 L.Ed.2d 675, 684-685, 97 S.Ct. 2010] [the right of minors to obtain contraceptives].) More recently, the court has stated that it is not "inclined to take a more expansive view of [its] authority to discover new fundamental rights embedded in the Due Process Clause." (*Bowers* v. *Hardwick* (1986) 478 U.S. 186, 194 [92 L.Ed.2d 140, 148, 106 S.Ct. 2841] [Georgia statute criminalizing sodomy between consenting adults does not violate fundamental rights].) The *Bowers* court reiterated that the nature of rights qualifying for heightened judicial protection "includes those fundamental liberties that are 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if [they] were sacrificed.' " (*Id.,* at pp. 191-192 [92 L.Ed.2d at p. 146]; see also *Paul* v. *Davis* (1976) 424 U.S. 693, 712-713 [47 L.Ed.2d 405, 420-421, 96 S.Ct. 1155] [interest in reputation neither " 'liberty' " nor " 'property' " interest under due process clause].)

■ We think, however, that case law establishes that an individual's right to choose clothing and overall appearance can be characterized as an aspect of liberty under the Fourteenth Amendment and as such is entitled to protection against arbitrary state action. (See, e.g., *De Weese* v. *Town of Palm Beach* (11th Cir. 1987) 812 F.2d 1365, 1367 [town ordinance prohibiting men from appearing in public without shirt bore no rational relationship

to any legitimate town interest, and as applied to shirtless male runner was unconstitutional; DeWeese had burden of establishing that ordinance was arbitrary and irrational]; see also cases cited in Comment, *Constitutional Validity of Employer Dress and Grooming Codes, supra,* 9 U.S.F. L.Rev. 515.) Nevertheless, dress regulations are common and have been upheld in a variety of noncustodial settings.

■ Private dress codes, express or implied, are enforced by social or economic pressure. They are not subject to constitutional challenge, because private conduct which does not involve governmental action does not generally fall within the proscriptions of the Fourteenth Amendment. (See *Shelley* v. *Kraemer* (1948) 334 U.S. 1, 13 [92 L.Ed. 1161, 1180-1181, 68 S.Ct. 836, 3 A.L.R.2d 441].) But such dress codes are not totally without restraint. Businesses open to the public such as inns and restaurants are subject to the mandates of California's Unruh Civil Rights Act prohibiting discrimination. (*Hales* v. *Ojai Valley Inn & Country Club* (1977) 73 Cal.App.3d 25, 28-29 [140 Cal.Rptr. 555, 89 A.L.R.3d 1] [judgment of dismissal after sustained demurrer reversed; reasonableness of requirement that men wear a tie depends on a number of facts, such as the nature of the establishment and local community standards of dress].) Such businesses may, however, "promulgate reasonable [nondiscriminatory] deportment regulations that are rationally related to the services performed and the facilities provided. [Citation.]" (See *In re Cox* (1970) 3 Cal.3d 205, 217 [90 Cal.Rptr. 24, 474 P.2d 992], fn. omitted; see also *Corn* v. *State* (Fla. 1976) 332 So.2d 4, 8 [nondiscriminatory restrictions on users of shopping mall]; *Feldt* v. *Marriott Corporation* (D.C.App. 1974) 322 A.2d 913, 915 [restaurant's right to have nondiscriminatory dress rules].)

Nondiscriminatory dress and grooming codes for employees have generally withstood challenge under the federal Civil Rights Act. (See Note, *Employer Dress and Appearance Codes and Title VII of the Civil Rights Act of 1964* (1973) 46 So.Cal.L.Rev. 965, 994-995, fn. 151.)

■ We need look no further than the typical courtroom to find examples of permissible governmental restrictions on clothing that nonconfined people are permitted to wear. In *People* v. *Rainey* (1964) 224 Cal.App.2d 93 [36 Cal.Rptr. 291], the trial court asked that in the future a female attorney refrain from wearing a distracting hat. (*Id.*, at p. 95.) Although the constitutional rights of the attorney were not in issue, the reviewing court found no misconduct on the part of the trial judge. (*Id.*, at p. 97.) Indeed, many appellate decisions have upheld the trial courts' right to impose standards of personal appearance or attire if the standards are reasonably related to the proper administration of justice. (Annot., Power of Court to Impose Standard of Personal Appearance or Attire (1976) 73 A.L.R.3d 353.)

In the academic field, the case law is variable, and whether the regulation is upheld often depends on the specificity of the regulation and the reasons advanced by the school authorities for the regulation. Dress codes for students have been upheld as an exercise of school authority. (*Montalvo* v. *Madera Unified Sch. Dist. Bd. of Education*, *supra*, 21 Cal.App.3d at p. 335; *Akin* v. *Board of Education of Riverside etc. Dist.* (1968) 262 Cal.App.2d 161, 169 [68 Cal.Rptr. 557]; contra, *Myers* v. *Arcata etc. School Dist.* (1969) 269 Cal.App.2d 549, 561 [75 Cal.Rptr. 68] [dress policy was vague and standardless].)

In *Finot* v. *Pasadena City Bd. of Education* (1967) 250 Cal.App.2d 189 [58 Cal.Rptr. 520], upon which petitioner relies, the court first found that a teacher's right to wear a beard while assigned to classroom teaching was a protected liberty interest under the due process provisions of the Fourteenth Amendment. (*Id.*, at pp. 197-198.) It then turned to the question of the degree of protection to which this constitutional right was entitled. Conceding that such a right involving nonverbal conduct is probably not within the literal scope of the First Amendment itself, the court nevertheless found the right was entitled to the peripheral protection of the First Amendment. (*Id.*, at p. 199.) For a man, the court stated, a beard "is an expression of his personality. On the one hand it has been interpreted as a symbol of masculinity, of authority and of wisdom. On the other hand it has been interpreted as a symbol of nonconformity and rebellion. But symbols, under appropriate circumstances, merit constitutional protection. [Citation.]" (*Id.*, at p. 201; contra, *East Hartford Ed. Ass'n* v. *Bd. of Ed. etc.*, *supra*, 562 F.2d at pp. 861-863; *King* v. *Saddleback Junior College District*, *supra*, 445 F.2d 932 [upholding school regulations and citing cases upholding and cases invalidating school grooming regulations].)

We find *Finot* inapposite for three reasons. First, it is more akin to those cases involving symbolic speech, and here the record reveals no message that the prisoners desire to convey through clothing choice. Second, the exchange of ideas is one of the paramount features of an academic forum, unlike a prison. Third, and most importantly, the *Finot* court, in finding the regulation invalid, stressed that the school had failed to show that the teacher's wearing of a beard would have any actual adverse effect on the educational process. (*Finot* v. *Pasadena City Bd. of Education*, *supra*, 250 Cal.App.2d at pp. 201-202.)

Most analogous to the case before us are those cases upholding grooming regulations for police, firefighters, and military units, whose uniform appearance has practical benefits. The United States Supreme Court addressed the issue in *Kelley* v. *Johnson*, *supra*, 425 U.S. 238, in which the court held that a county regulation limiting the length of a male police officer's hair

did not violate any right guaranteed by the Fourteenth Amendment. In *Kelley,* the court assumed that the citizenry at large had "some sort of 'liberty' interest within the Fourteenth Amendment in matters of personal appearance," but emphasized that the police officer had sought the protection of the Fourteenth Amendment not as a member of the citizenry at large, but as an employee of the police department. (*Id.,* at pp. 244-245 [47 L.Ed.2d at pp. 713-714].) The court pointed out that it had sustained substantial restrictions on the First Amendment rights of public employees that differed significantly from the regulation of speech of the citizenry in general. "If such state regulations may survive challenges based on the explicit language of the First Amendment, there is surely even more room for restrictive regulations of state employees where the claim implicates only the more general contours of the substantive liberty interest protected by the Fourteenth Amendment." (*Id.,* at p. 245 [47 L.Ed.2d at p. 714].) The court, using the rational basis test, further concluded that the regulations imposed by the county were entitled to a presumption of legislative validity, and that the police officer had the burden of demonstrating that the regulations were so irrational as to be arbitrary and therefore a deprivation of the police officer's " 'liberty' " interest. (*Id.,* at pp. 247-248 [47 L.Ed.2d at pp. 715-716]; see also *Quinn* v. *Muscare* (1976) 425 U.S. 560 [48 L.Ed.2d 165, 96 S.Ct. 1752] [firefighter's hair regulation]; *Gianatasio* v. *Whyte* (2d Cir. 1970) 426 F.2d 908, cert. den. (1970) 400 U.S. 941 [27 L.Ed.2d 244, 91 S.Ct. 234] [National Guard].)

■ We are not persuaded by petitioner's assertion that his right to freedom of choice in personal appearance must be that of the citizenry at large. Prisoners, like the police and firefighters, are subject to the reasonable institutional regulations relating to clothing and grooming. We find no logic in according prisoners greater rights than public employees, whose more fundamental First Amendment rights can be curtailed. (*Kelley* v. *Johnson, supra,* 425 U.S. at pp. 244-245 [47 L.Ed.2d at pp. 713-714]; *East Hartford Ed. Ass'n* v. *Bd. of Ed. etc., supra,* 562 F.2d at pp. 860-861; see *Goldman* v. *Weinberger* (1986) 475 U.S. 503, 509-510 [89 L.Ed.2d 478, 485-486, 106 S.Ct. 1310]; *Connick* v. *Myers, supra,* 461 U.S. at p. 149 [75 L.Ed.2d at pp. 721-722]; *Cooper* v. *Eugene Sch. Dist. No. 4J* (1985) 76 Ore.App. 146 [708 P.2d 1161, 1165-1168], revd. on a different ground in *Cooper* v. *Eugene Sch. Dist. No. 4J* (1986) 301 Ore. 358 [723 P.2d 298, 313-314] [regulation banning the wearing by a teacher of religious dress (in this case, the white clothing and turban traditional to the Sikhs) while teaching school did not violate the First Amendment or the Oregon Constitution guaranty of freedom of religion, because the aim of the regulation was to guarantee religious neutrality in the public schools].)

In summary, we hold that personal expression through clothing choice implicates "the more general contours of the substantive liberty interest

protected by the Fourteenth Amendment . . ." (*Kelley* v. *Johnson, supra,* 425 U.S. at p. 245 [47 L.Ed.2d at p. 714]) and therefore comes within the rights protected by section 2600. The right is not absolute, and the validity of reasonable limitations on the right will depend upon the circumstances of each case. We emphasize that we do not classify the nonspecific right to clothing choice with rights that the courts have found to be fundamental, such as those of speech and free exercise of religion protected by the First Amendment and the basic personal rights protected by the Fourteenth Amendment. No court has so held, and we decline to declare a rule that would require strict judicial scrutiny of every regulation of personal appearance.[12]

D. *California Constitutional Right of Privacy.* ■ Petitioner also claims that he has a fundamental right of personal expression under section 1 of article I of the California Constitution, which provides that: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." We disagree. The privacy right of prisoners was addressed in *In re Cummings* (1982) 30 Cal.3d 870 [180 Cal.Rptr. 826, 640 P.2d 1101, 29 A.L.R.4th 1207] (plur. opn. of Richardson, J.) upholding as reasonable a prison ban on overnight visits for persons having only a common law relationship with the prisoner. The court held that "the right-of-privacy cases relied on by petitioner (e.g., *Committee to Defend Reproductive Rights* v. *Myers* (1981) 29 Cal.3d 252 [172 Cal.Rptr. 866, 625 P.2d 779], and *City of Santa Barbara* v. *Adamson* (1980) 27 Cal.3d 123 [164 Cal.Rptr. 539, 610 P.2d 436]) are inapposite, for they concern the personal or privacy rights of nonprisoners. Rights of privacy, like associational rights, are necessarily and substantially abridged in a prison setting."[13] (*Cummings, supra,* at

---

[12] We are aware that "[h]istory is dotted with instances of governments regulating the personal appearance of their citizens . . ." in a manner clearly violative of the rights guaranteed by our Constitution. (*Kelley* v. *Johnson, supra,* 425 U.S. at pp. 253-254, fn. 4 [47 L.Ed.2d at p. 719] (dis. opn. of Marshall, J.); see also *East Hartford Ed. Ass'n* v. *Bd. of Ed. etc., supra,* 562 F.2d at p. 842 (opn. of Oakes, J.) opn. vacated and lower court decision affd. after rehg. en banc.) Both Justice Marshall and Judge Oakes cited the instance, among others, of Peter the Great's edict in 1698 imposing sanctions on the wearing of beards throughout Russia in an effort to stimulate adoption of a modern lifestyle compatible with Western Europe. We are not called upon here to address such a heavy burden on appearance.

[13] We are not unmindful of the statement in *De Lancie* v. *Superior Court, supra,* 31 Cal.3d at page 868, that "prisoners retain the rights of free persons, including the right of privacy . . . ." In that civil action, county inmates sought declaratory relief against monitoring of their conversations with visitors in the county jail. The court found that the inmates had stated a cause of action for violation of their statutory rights under section 2600 and did not reach the constitutional issue. (*De Lancie, supra,* at p. 877.) However, in holding that *De Lancie* was not retroactive, our Supreme Court acknowledged that *De Lancie* was not just a simple case of statutory interpretation, but implicated constitutional considerations on the right of privacy. (*People* v. *Edelbacher* (1989) 47 Cal.3d 983, 1004 [254 Cal.Rptr. 586, 766

p. 873, citing *In re Price* (1979) 25 Cal.3d 448, 452-453 [158 Cal.Rptr. 873, 600 P.2d 1330].)

Although our Supreme Court has not fully defined the privacy rights of prisoners, in this instance we think the reasoning of *Cummings* is applicable. A person's reasonable expectation of privacy is conditioned by the world in which he or she lives. (*Chico Feminist Women's Health Center* v. *Scully* (1989) 208 Cal.App.3d 230, 242 [256 Cal.Rptr. 194].) The very nature of the prison environment precludes any reasonable expectation that some privacy rights, such as the right to travel, to choose one's food,[14] to associate freely with others, to possess unlimited personal effects, and to choose one's clothing, will not be abridged during incarceration. (*In re Harrell* (1970) 2 Cal.3d 675, 693 [87 Cal.Rptr. 504, 470 P.2d 640]; cf. *People* v. *Mills* (1978) 81 Cal.App.3d 171, 181 [146 Cal.Rptr. 411] [sex offender has waived right to privacy and forfeited right to travel without local registration]; see also *Loder* v. *Municipal Court* (1976) 17 Cal.3d 859, 864-865 [132 Cal.Rptr. 464, 553 P.2d 624] [arrestee's right of privacy not violated by public reporting of facts relating to his arrest and circumstances of crime].)

Furthermore, even for nonconfined persons, the California constitutional right of privacy is not absolute; reasonable limitations that do not unduly burden the right are valid. (*Wilkinson* v. *Times Mirror Corp.* (1989) 215 Cal.App.3d 1034, 1046-1051 [264 Cal.Rptr. 194].) Abridgement of an incarcerated person's right to personal expression through clothing choice is such a reasonable limitation.

## V. *Statutory Right to Clothing Choice*

 Petitioner also claims that section 2601 guaranteeing prisoners the right to "inherit, own, sell, or convey real or personal property . . ." affords them the right to possess and wear civilian clothing in prison. We disagree.

The Penal Code contains statutory authority for finding that the warden has a right to restrict or otherwise control the clothing worn by inmates. This restriction has been authorized by statute since at least 1907, when the Legislature enacted a new title in the Penal Code governing state prisons.

---

P.2d 1]; *Donaldson* v. *Superior Court* (1983) 35 Cal.3d 24, 37[196 Cal.Rptr. 704, 672 P.2d 110]; see *People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1096 [259 Cal.Rptr. 630, 774 P.2d 659], applying pre-*De Lancie* law.) In none of these cases was *Cummings* overruled, modified, or disapproved.

[14] Petitioner analogizes his right to choose food by buying at the canteen to the right to choose his clothing. He overlooks section 5005, which provides that "[t]he department *may* maintain a canteen at any prison . . . ." (Italics added.) The discretion conferred on the department to operate a canteen provides no continuing guaranty of free choice of food.

(Stats. 1907, ch. 317, § 1, p. 584.) Section 1587 provided in relevant part, "Each convict shall be provided . . . with garments of coarse, substantial material, of distinctive manufacture . . . ." (Stats. 1907, ch. 317, § 1, p. 590.) This portion of the statute was reenacted verbatim in 1939. (Stats. 1939, ch. 625, § 1, p. 2042.) It was later renumbered as section 2084 (Stats. 1941, ch. 106, § 15, p. 1088) and was amended to direct "the department" rather than the prison warden to provide the listed items (Stats. 1957, ch. 2256, § 15, p. 3927).

When the code provisions on prisons were modernized in 1987, the requirement that an inmate's garments be of "coarse" material was deleted, but the requirement that clothing be provided which is of "distinctive manufacture" was retained. (Stats. 1987, ch. 828, § 117, No. 9 West's Cal. Legis. Service, p. 412; No. 3 Deering's Adv. Legis. Service, p. 2458.) Today, section 2084 reads: "The department shall provide each prisoner with a bed, sufficient covering of blankets, and with garments of substantial material and of distinctive manufacture, and with sufficient plain and wholesome food of such variety as may be most conducive to good health."

Although this statute has been characterized as imposing penal conditions (*People* v. *Feagley* (1975) 14 Cal.3d 338, 364-365 [121 Cal.Rptr. 509, 535 P.2d 373]), we think the more accurate view is that it was intended to preserve inmates' rights (*In re Head, supra,* 42 Cal.3d at p. 230). In fact, it can be read as accomplishing both. Requiring an inmate to wear clothing which is of "distinctive" manufacture may be characterized as penal, but guaranteeing that the inmate is provided with adequate clothing is protective. In whatever way one views this statute, however, one aspect remains clear. The Legislature has authorized the Department of Corrections to provide inmates with "distinctive" clothing. "Distinctive" means, as it meant at the time of original enactment, clothing which is manufactured in a manner as to distinguish it in its relation to clothing worn by noninmates. (See Webster's New Internat. Dict. (rev. ed. 1919) p. 648.) The consistent legislative purpose from 1907 until its most recent enactment in 1987 could be none other than to protect against prison escapes and to ensure that escaped inmates would be quickly identified and recaptured.

A further indication of the legislative intent that prisoners wear distinctive clothing is demonstrated by Welfare and Institutions Code section 5325, enacted in 1972, which guarantees a person involuntarily detained for psychiatric evaluation the right "(a) To wear his or her own clothes; to keep and use his or her own personal possessions including his or her toilet articles . . . ." This section reflects the legislative awareness of the psychological and emotional value of personal clothing to a detained person. Yet in 1975, when the Legislature reenacted section 2601 setting out

the specific rights of prisoners "[t]o inherit, own, sell, or convey real or personal property, . . ." it did not include the right to wear, keep, and use his or her own personal possessions in prison. This legislative omission is significant.

Our conclusion that the Legislature did not intend statutorily to grant prisoners the right to possess civilian clothing in prison is also supported by the legislative history behind sections 2600 and 2601. The Assembly Committee on Criminal Justice stated that the Senate Judiciary Committee had described the bill enacting those sections as "adher[ing] generally to the recommendations of the National Commission on Criminal Justice Standrds [*sic*] and Goals concerning corrections." (Assem. Com. on Crim. Justice, Dig. of Assem. Bill No. 1506 (1975-1976 Reg. Sess.) p. 2.)[15] Although aware of the National Commission's recommendation on personal clothing for prisoners, the Legislature neither incorporated the right to wear clothing in section 2601 nor limited the right of the Director of the Department of Corrections under section 5058 to issue regulations on the prisoners' use of personal clothing. We note that the Legislature did follow the recommendation of the commission by specifying the right to have personal visits among the rights enumerated in section 2601. (*In re French* (1980) 106 Cal.App.3d 74, 83-84 [164 Cal.Rptr. 800].)

Regulations promulgated by the Department of Corrections reflect the mandate of section 2084. They require that institutions "will provide each inmate with state clothing which is adequate and appropriate for the inmate's assignment and leisure time activities . . . ." (Cal. Code Regs., tit. 15, § 3030.) At the same time, the regulations allow for personal clothing, but only within strict limitations: "Inmates may possess only those items of personal clothing authorized by the warden. . . ." (Cal. Code Regs., tit. 15, § 3032, subd. (b).)

Petitioner's reliance on *In re Parker* (1984) 151 Cal. App.3d 583 [198 Cal.Rptr. 796] is misplaced. There, the court affirmed an order enjoining prison officials from enforcing any regulation prohibiting prisoners from

---

[15]The cited standards and goals provide in relevant part: " 'Each correctional agency should immediately develop policies and procedures to assure that individual offenders are able to exercise their constitutional rights of free expression and association to the same extent and subject to the same limitations as the public at large. Regulations limiting an offender's right of expression and association should be justified by a compelling state interest requiring such limitation. Where such justification exists, the agency should adopt regulations which effectuate the state interest with as little interference with an offender's rights as possible. [¶] Rights of expression and association are involved in the following contexts: [¶] 1. Exercise of free speech . . . . [¶] 8. Preserving identity through distinguishing clothing, hairstyles, and other characteristics related to physical appearance. . . .' " (Sen. Judiciary Com., Dig. of Assem. Bill No. 1506 (1975-1976 Reg. Sess.) p. 2.)

establishing passbook savings accounts in financial institutions where there were less restrictive alternatives to combat the danger of trafficking in narcotics and other contraband in prison. *Parker* does not reveal whether the inmates had actual physical possession of a passbook. It is not authority for judicial insertion into section 2601 a right to *possess or wear* civilian clothing in prison. (See Cal. Code Regs., tit. 15, § 3192 ["An inmate's right to inherit, own, sell or convey real or personal property does not include the right to possess such property within the institutions of the department . . . ."].)

Petitioner also argues that section 2600 itself is a source of statutory rights. His reliance on *Keyhea* v. *Rushen* (1986) 178 Cal.App.3d 526 [223 Cal.Rptr. 746] for this proposition is mystifying. In *Keyhea,* the court held that statutory rights such as those in the Lanterman-Petris-Short Act (Welf. & Inst. Code, § 5000 et seq., pertaining to competency hearings) as well as constitutional rights were extended to prisoners under section 2600. Petitioner cites to no statute other than section 2601, which we have rejected, giving prisoners a statutory right to wear civilian clothing in prison.

We hold that sections 2600 and 2601 do not confer any statutory right on prisoners to possess and wear personal civilian clothing in prison.

## VI. *Security Problems*

Having determined that a "right" is implicated by the July 30 memorandum, we next examine whether a "reasonable security" problem exists which would justify deprivation of that right under section 2600. (*In re Arias, supra,* 42 Cal.3d at pp. 689-690; *In re Bell* (1980) 110 Cal.App.3d 818, 821 [168 Cal.Rptr. 100].)

The *Arias* court pointed out that " '[r]easonableness' " is an objective standard and cautioned that "in assessing the existence of a security risk in correctional institutions, courts should give some deference to prison officials' experience and expertise, unless it is shown that these security concerns are exaggerated or not sincerely held." (*In re Arias, supra,* 42 Cal.3d at p. 696; see also *Bailey* v. *Loggins* (1982) 32 Cal.3d 907, 922 [187 Cal.Rptr. 575, 654 P.2d 758]; *In re Price, supra,* 25 Cal.3d at pp. 453-454.)

The trial court agreed with the warden that San Quentin was experiencing a security problem with respect to escapes. But it gave no weight to the warden's evidence or deference to his experience and expertise when it concluded that there was "no rational relationship between the prior policy of permitting limited personal clothing and escapes from San Quentin." This was based on the finding that "[t]he evidence presented does not

establish that personal clothing legitimately possessed by inmates was a proximate cause of any escapes or escape attempts. It is true that some prisoners were wearing personal clothing when they attempted to escape and that others may have worn a civilian shirt when they escaped. That, however, does not mean it facilitated their escape in any meaningful way."

We reject the trial court's conclusion for two reasons. First, the issue was whether the warden's concern that civilian clothing might contribute to the escape problem was reasonable, not whether he could prove that the clothing caused the escapes. Second, the evidence was insufficient to establish that the clothing was not useful in facilitating the escapes or escape attempts.

The warden and his two expert witnesses, Amos Reed and Jiro Jerry Enomoto, testified that the use of civilian clothing was one factor in the escapes and attempted escapes. As we have noted, the warden's expert witnesses were asked whether they could say that "but for" such clothing the escapes would not have occurred; of course, they could not. These negative answers to a hypothetical question tended to prove only a very narrow point, namely, that the escapes might have occurred even if the prisoners had been wearing prison garb. This does not constitute substantial evidence that clothing had no effect or that it was not one of a number of "proximate" causes of the escapes. Nor is it evidence that the warden's security concern was unreasonable.

Only one witness expressed an opinion that might conceivably be cited as supporting the trial court's finding. Professor Cannon said, "I don't believe the clothing issue really has any impact on how the people manage to escape or whatever." This is not substantial evidence which supports the trial court's finding.

 " '[S]ubstantial' " means that the evidence must be of "ponderable legal significance." It does not mean simply " 'any' " evidence. "It must be reasonable in nature, credible, and of solid value; it must actually be 'substantial' proof of the essentials which the law requires in a particular case." (*Estate of Teed* (1952) 112 Cal.App.2d 638, 644 [247 P.2d 54]; see 9 Witkin, Cal. Procedure, Appeal, *supra*, at § 285, p. 296.) The weight to be given to expert testimony depends on the material and reasoning upon which it is based. "Such an opinion is no better than the reasons given for it [citation], and if it is 'not based upon facts otherwise proved, or assumes facts contrary to the only proof, *it cannot rise to the dignity of substantial evidence.*' [Citations.]" (*White* v. *State of California* (1971) 21 Cal.App.3d 738, 760 [99 Cal.Rptr. 58], italics added by the White court.)

In his beginning testimony, Professor Cannon stated uncategorically that "the only way a person escapes from an institution is when there's a breakdown in the perimeter control of the institution on the part of the security staff." It is clear that he was speaking theoretically and that his opinion is simply a meaningless truism: people escape because they manage to get out. Professor Cannon's opinion that clothing is irrelevant was predicated upon a single-minded abstract view of the cause of prison escapes generally. He had no psychological or statistical studies on the causes of escapes to support his view; he did not obtain any oral or written statements about the escape attempts from inmates or correctional officers at San Quentin; he gave no weight to the warden's evidence. (See *San Diego Gas & Elec. Co.* v. *Sinclair* (1963) 214 Cal.App.2d 778, 783 [29 Cal.Rptr. 769]; *Bowers* v. *Olch* (1953) 120 Cal.App.2d 108, 112-114 [260 P.2d 997].)

■ Thus, the only evidence of substance was that a security problem existed at San Quentin and that possession of civilian clothing contributed in some way to the escapes and attempted escapes. It is worth noting that the Legislature has made it a felony for any person "who carries or sends into a prison or jail *anything useful* to aid a prisoner or inmate in making his [or her] escape, with intent thereby to facilitate the escape . . . ." (§ 4535, italics added.) Certainly, civilian clothing is "useful" to a prisoner attempting or effectuating an escape—whether brought in by an outsider or allowed by prison rules.

We conclude that, as a matter of law, the warden established that his security concerns about civilian clothing were objectively reasonable. The trial court erred when it concluded that the prisoners' possession and use of civilian clothing had no relationship to the security problem posed by the escapes and escape attempts.

VII. *The Warden's Response to the Security Threat*

In considering whether the warden's restriction on civilian clothing was necessary, we begin with the standard of review applicable to claimed violations of constitutional rights.

■ Traditionally, a regulation touching on fundamental rights is subject to the strict scrutiny standard of review under which the state bears the burden of establishing that a substantial or compelling interest justifies the regulation and that the regulation is narrowly drawn to accommodate that interest. (*In re Arias, supra,* 42 Cal.3d at p. 692; *People* v. *Privitera* (1979) 23 Cal.3d 697, 702 [153 Cal.Rptr. 431, 591 P.2d 919, 5 A.L.R.4th 178]; *In re Gatts* (1978) 79 Cal.App.3d 1023, 1029 [145 Cal.Rptr. 419]; see also *People* v. *McCaslin* (1986) 178 Cal.App.3d 1, 7 [223 Cal.Rptr. 587].) However, if a

lesser right such as the prisoners' right to clothing choice is involved, the regulation is reviewed under the rational basis test. That is, the regulation is presumed to be a valid exercise of state authority, and the burden is on the one challenging it to prove that it is so irrational as to be arbitrary or capricious and therefore an unconstitutional deprivation of the challenger's right. (*Kelley* v. *Johnson, supra,* 425 U.S. at pp. 247-248 [47 L.Ed.2d at pp. 715-716]; *Scherling* v. *Superior Court* (1978) 22 Cal.3d 493, 503 [149 Cal.Rptr. 597, 585 P.2d 219]; *Gatts, supra,* 79 Cal.App.3d at p. 1029; *Montalvo* v. *Madera Unified Sch. Dist. Bd. of Education, supra,* 21 Cal.App.3d at p. 335; *Jacobs* v. *Kunes* (9th Cir. 1976) 541 F.2d 222, 224.)

As we stated above, the 1975 reenactment of section 2600 providing that prisoners can be deprived of only such rights as is "necessary" to provide for the reasonable security of the institution and for the reasonable protection of the public has triggered a reassessment of the traditional standards of review set out above and a departure by the California Supreme Court from the federal standards applicable to prisoners' rights cases.

In *Arias,* where abridgement of the fundamental right to free exercise of religion was in issue, the court considered which party has the burden of proving the elements of a section 2600 violation. It determined that where the inmates have shown that their rights are implicated by the action of the correctional authority and the correctional authority has shown an objective basis for its security concerns (its good faith is presumed), the burden is on the correctional authority to prove the absence of less drastic means to meet the security need. "This is consistent with established principles of constitutional law, since fundamental rights of individuals cannot be abridged unless the state shows the abridgment is 'necessary' to further a compelling governmental interest." (*In re Arias, supra,* 42 Cal.3d at p. 697, fn. 34.)

The trial court, applying both the rational basis test and the hybrid test articulated in *Arias,* which shifts the burden of proof, concluded that "restrictions imposed on clothing to prevent future escapes are arbitrary. At most, they are an exaggerated response to a tangentially related problem." Alternatively, the court found that the warden had not met his burden of proving the absence of less restrictive alternatives.

 Are the clothing restrictions so irrational as to be arbitrary and therefore an unconstitutional deprivation of the challenger's right? We think not. The evidence supports the warden's determination that the prisoners' access to civilian clothing posed a security threat. His concern was

objectively reasonable, and measures were needed to meet that institutional threat. Because the restrictions are rationally related to the state's important interest in maintaining prison security, they are not arbitrary and thus not constitutionally infirm. (*Kelley* v. *Johnson, supra,* 425 U.S. at pp. 247-248 [47 L.Ed.2d at pp. 715-716].)

Warden Vasquez testified that he considered other alternatives to the July 30 memorandum, but that they were "a lot more restrictive" than the decision he made in the memorandum. One alternative he considered was banning level IV general population inmates from access to programs in the lower yard area of San Quentin, which include industries and the main exercise yard. This would mean the inmates would lose their jobs, which were relatively well paying. It would also have a negative effect on control of the inmates, who achieve a positive sense of identity through their work. He eliminated this option as too severe. In Warden Vasquez's opinion, limiting access to personal clothing was less severe and more effective in the long run.

The trial court impliedly found that the warden failed to use the less restrictive alternative of strengthening security measures to prevent escapes. Professor Cannon testified that he was impressed with the security at San Quentin, and an attorney from the Prison Law Office submitted a declaration outlining the strict security procedures he encountered when going there to interview a prisoner-client. Even so, lapses in security occur mainly through human error. The trial court's decision requiring the elimination of human error as a less drastic alternative was unreasonable and impossible for the warden to accomplish.

In determining that the warden did not act in the least restrictive way, the trial court ignored the admonition in *In re Harrell, supra,* 2 Cal.3d at page 698, that "[s]ection 2600 cannot be construed as a straitjacket limiting the ability of prison authorities to deal with institutional realities." It also failed to observe that "the courts give deference to determinations by prison officials that restrictions are essential to protect a legitimate state interest. [Citations.]" (*Bailey* v. *Loggins, supra,* 32 Cal.3d at p. 922.)

Our review of the record as a whole shows that the warden's decision was proper under either the less drastic means or the rational basis test. (*In re Price, supra,* 25 Cal.3d at p. 453.) As we have seen, the regulation established in the July 30 memorandum was the product of thoughtful analysis by the warden of San Quentin, taking into account all the facts at his disposal. The soundness of the warden's reasoning was supported by two

experts who testified below. The trial court improperly rejected all of the substantial evidence when it second-guessed the party charged with administering the prison and substituted its judgment for that of the warden. The function of the trial court was to determine the statutory and constitutional validity of the clothing restrictions, not the wisdom of the warden's decision. (*Galvan* v. *Superior Court* (1969) 70 Cal.2d 851, 869 [76 Cal.Rptr. 642, 452 P.2d 930].)

If the trial court's conclusion that prisoners have a fundamental right to clothing choice were permitted to stand, the prisoners could no longer be required to wear blue jeans to distinguish them from staff and visitors. Their choice of clothing would be unlimited. In sum, the trial court's holding could have far-reaching and devastating consequences for prison discipline and security. ▮ The trial court failed to heed the rule enunciated in *Arias* and elsewhere that by enacting section 2600 the Legislature intended not to expand the rights of inmates to be greater than those of nonconfined persons, but to " ' . . . place the rights of inmates as nearly as possible on the same footing as noninmates, subject to the needs of institutional security or protection of the public.' [Citation.]" (*In re Arias, supra,* 42 Cal.3d at p. 689.)

▮ We conclude that a warden must have the flexibility to control civilian clothing in prison. The usefulness of such clothing in escapes is only one of the problems that might arise. For instance, in *Lyon* v. *Farrier* (8th Cir. 1984) 730 F.2d 525, 526, upholding clothing restrictions in the Iowa State Penitentiary, the court pointed out that during a riot, prison officials had a difficult time distinguishing inmates in their civilian clothing from other persons, and that fire officials had determined that the large amount of property the inmates were storing in their cells created a fire hazard. We can see other dangers. Color-coded clothing can identify gang membership, with attendant problems for prisoners and prison administrators. Disparity in economic ability to acquire clothing can foster jealousies and discontent. A warden must have the authority to take immediate action to quell any such threats as they arise without having first to consider a temporary restraining order and to prove to a court that such action is necessary.

## VIII. *Conclusion*

We hold that the warden's clothing restrictions set out in the July 30 memorandum did not violate the constitutional or statutory rights of the prisoners and were not only permissible under section 2600, but also were

authorized by sections 2079 and 2084, as well as title 15, California Code of Regulations, sections 3032 and 3190.

The order is vacated, and the matter is remanded to the trial court with directions to deny the petition for relief and to discharge the order to show cause.

White, P. J., and Merrill, J., concurred.

A petition for a rehearing was denied August 22, 1990.